PETER M. HUGHES, ESQ. (State Bar No. 134944)
**WILSON, ELSER, MOSKOWITZ,**
   **EDELMAN & DICKER LLP**
655 West Broadway, Suite 900
San Diego, CA 92101-8484
Telephone: (619) 321-6200
Facsimile: (619) 321-6201
Email: peter.hughes@wilsonelser.com

Attorneys for Plaintiff and Counter-Defendant
Certain Interested Underwriters at Lloyd's, London

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CERTAIN INTERESTED UNDERWRITERS AT LLOYD'S, LONDON, <br><br> Plaintiff, <br><br> vs. <br><br> BEAR LLC, a Delaware Limited Liability Company, and DOES 1 through 50, <br><br> Defendants. | Case No.  15-cv-0630-BTM(BML) <br> Associated Case: 14-cv-02960-BTM-BLM <br><br> **IN ADMIRALTY** <br><br> **CERTAIN INTERESTED UNDERWRITERS AT LLOYD'S, LONDON'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE, SUMMARY ADJUDICATION OF CLAIMS AND/OR DEFENSES** |
| BEAR, LLC, a Delaware Limited Liability Company, <br><br> Counterclaimant, <br><br> vs. <br><br> CERTAIN INTERESTED UNDERWRITERS AT LLOYD'S, LONDON, <br><br> Counter-Defendant, <br><br> and <br><br> MARSH USA, INC., a Delaware corporation, <br><br> Third-Party Defendant. | Judge:     Hon. Barry Ted Moskowitz <br> Location:  Courtroom 15B <br><br> Magistrate: Hon. Barbara Lynn Major <br> Location:   11th Floor <br><br><br> Date:      September 23, 2016 <br> Time:     11:00 a.m. <br> Judge:    Hon. Barry Ted Moskowitz <br> Courtroom: 15B (Carter & Keep) <br><br> **NO ARGUMENT UNLESS REQUESTED BY THE COURT** |

1816026v.1

# TABLE OF CONTENTS

I. PRELIMINARY STATEMENT ........................................................................ 1

II. FACTUAL BACKGROUND ......................................................................... 2

    A. Background of the Insurance Policies ................................................ 2

    B. The Events Leading to the Destruction of the *Polar Bear* ................. 8

    C. The Sue and Labor Clause in the Cover Note ................................... 12

III. SUMMARY JUDGMENT STANDARD ....................................................... 13

IV. LEGAL ARGUMENT ................................................................................ 13

    A. Choice Of Law Analysis ................................................................. 13

    B. Total Loss Coverage is Void Because Bear Breached Multiple
       Conditions Precedent in the Policy ................................................... 15

       1. Maritime Insurance Policies Are Strictly Interpreted ........... 15

       2. Whether The Loss Was Caused By, Or Related To, The
          Breach Of The Condition Precedent Is Irrelevant ................. 18

    C. Bear had Notice of the Existence of the Conditions Precedent ......... 19

       1. Bear Knew How To Satisfy The Conditions Precedent ......... 20

       2. Marsh Is Not Underwriters' Agent ...................................... 22

    D. Bear's Counterclaims Fail as a Matter of Law ................................. 24

V. CONCLUSION ........................................................................................ 25

1816026v.1

# <u>TABLE OF AUTHORITIES</u>

## CASES

*AES Puerto Rico, L.P. v. Alstrom Power, Inc.,*
  429 F. Supp. 2d 713 (D. DE. 2006) ............................................................... 14, 15

*Aguirre v. Citizens Casualty Co. of NY,*
  441 F.2d 141 (5th Cir.), *cert. denied*, 404 U.S. 829 (1971) ........................... 16, 18

*American Title Ins. Co. v. Lacelaw Corp.,*
  861 F.2d 224 (9th Cir. 1988) .......................................................................... 16, 20

*Celotex Corp. v. Catrell,*
  477 U.S. 317 (1986) .............................................................................................. 13

*Guam Industries Servs., Inc. v. Zurich American Ins. Co.,*
  787 F.3d 1001 (9th Cir. 2015).................................................................. 15, 16, 18

*Imperial Casualty & Indem. Co. v. Sogomonian,*
  198 Cal. App. 3d 169 (1988) ................................................................................ 24

*Kiernan v. Zurich Cos.,*
  150 F.3d 1120 (9th Cir. 1998)............................................................................... 14

*LA Sound USA, Inc. v. St. Paul Fire & Marine Ins. Co.,*
  156 Cal. App. 4th 1259 (2007).............................................................................. 24

*Lexington Ins. Co. v. Cooke's Seafood,*
  835 F.2d 1364 (11th Cir. 1988)....................................................................... 15, 16

*Meridian Textiles v. Indemnity Insurance Co. of North America, F. Supp. 2d,*
  611  (CD Cal 2008) ............................................................................................... 14

*Pacific Employers Ins. Co. v. Sealaska Timber Co., Administrative,*
  No. C87-963C, 1993 A.M.C. 350 (W.D. Wash., May 6, 1988) ........................... 24

*Underwriters. Certain Underwriters at Lloyd's, London v. Giroire,*
  27 F. Supp. 2d 1306 (1998)................................................................................... 23

*Wilburn v. Fireman's Fund Ins. Co.,*
  348 U.S. 310, 1955 AMC 467 (1955) ................................................................... 14

*Yu v. Albany Ins. Co.,*
  281 F. 3d 803 (9th Cir. 2002)................................................................................ 14

## RULES AND REGULATIONS

Fed. R. Civ. P. 9(h) ....................................................................................... 13, 14

Fed. R. Civ. P.56(a) ............................................................................................... 1

1816026v.1

Plaintiff Certain Interested Underwriters at Lloyd's, London ("Underwriters") hereby submits this Memorandum of Points and Authorities in support of its Motion for Summary Judgment or in the Alternative, Summary Adjudication as to Claims and/or Defenses as to all causes of action pursuant to FRCP 56(a).

## I.  **PRELIMINARY STATEMENT**

This is a dispute over insurance coverage under a marine insurance policy for the total destruction of the yacht *Polar Bear* owned by Defendant Bear, LLC ("Bear"). Underwriters issued a Marine Hull Policy covering the *Polar Bear* for the period between August 26, 2013 and August 25, 2014. The policy contained conditions precedent that required Bear to:

a) notify Underwriters of any intent to commence major repairs or Hot Work on the *Polar Bear*;

b) notify Underwriters if the boat yard where repairs are being performed requests a waiver of subrogation; and

c) provide copies of the yard's insurance documentation and a schedule of works to be performed on the *Polar Bear*.

*By its own admission*, Bear intentionally and deliberately did not comply with these conditions precedent, and the *Polar Bear* was subsequently destroyed in a fire while undergoing major repairs. Bear's undisputed breach of these pre-conditions to coverage relieves Underwriters from any obligation to cover the loss of $17.250M under the policy as a matter of law. Further, after the initial grounding that sent it to the yard for repairs, Bear failed to provide written notice of a claim and loss for the expenses relating to safeguarding the vessel pursuant to the Sue and Labor clause of the policy. Moreover, Bear failed to provide receipted bills of $14,407.50 as required by the Notice Of Loss And Filing Of Proof clause until July 15, 2016. These facts are undisputed and Summary judgment in favor of Underwriters is warranted.

## II.  FACTUAL BACKGROUND

### A.  Background of the Insurance Policies

In 2010, Bear completed construction of the motor yacht *Polar Bear*, a marine vessel. Since then, Roger Trafton ("Trafton") has served as Captain of the *Polar Bear*, and Larry Jodsaas ("Jodsaas") has served as the principal of Bear, LLC. (Ex. A-4 at ¶ 14.) Both orally and in writing, Jodsaas tasked Trafton, as Jodsaas' agent and manager, with entering into contracts for repair to the vessel, to contact Marsh USA ("Marsh") as required under the policy and to gather documentation and information to submit Notice of Claim to Marsh or Underwriters. ("Ex. B2-261-262 at 679:5-680:23.) Bear asked its U.S. insurance broker, Marsh, to obtain a policy of insurance for the *Polar Bear*. Marsh submitted requests for insurance quotes for the *Polar Bear* to a number of insurers, including Underwriters through Marsh's London broker, Ropner Insurance Services ("Ropner"). After reviewing various options and some negotiation of the included terms, Bear elected to purchase the policy quoted by Underwriters. This policy was subsequently renewed twice, with the second renewal being the operative policy.

With each renewal, the policy contained terms and conditions that were virtually identical. Bear received copies of each of these policies from its U.S. broker, Marsh. (Ex. B2-246-247 at 626:16-627:10, Ex. B1-241-242 at 507:14-508:15; Ex. C-265; Ex. D-284 at 278:11-25, Ex. D-289-290 at 295:13-296:7, Ex. D-281 at 270:1-13, Ex. D-281-282 at 270:22-271:16, Ex. D-283 at 272:1-22,Ex. D-271-272 at 176:14-177:14; Ex. E-293; Ex. F-294; Ex. G-295). While Jodsaas currently suffers from Alzheimer's and does not recall many specifics, he testified that if he received an insurance policy he would have reviewed it, and that he recalled receiving documentation from Marsh at different times. (Ex. H-297 at 62:8-10, Ex. H-302 at 72:5-8.)

In 2011, 2012, and 2013, Marsh transmitted to Bear "Cover Notes" evidencing insurance coverage under each policy. (Ex. I-312-363; Ex. J-364-414; Ex. K-415-

472.) Marsh considered the Cover Notes to be the policy. The 2013 insurance coverage did not reference the term "Cover Note." (Ex. D-272 at177:15-22, Ex. D-288-289 at 294:10-295:8.) The 2012 and 2013 Cover Notes had similar 'conditions precedent';[1] specifically, the September 5, 2012 and August 28, 2013 Cover Note included wording under the bold, capitalized heading "**CONDITIONS**" and/or "**CONDITIONS PRECEDENT**" that read (in relevant part):

> **Maintenance and Repair Clause** It is hereby understood and agreed that this insurance will remain in full force whilst your yacht is undergoing annual maintenance, repair of any part or replacement of any part like for like.
>
> **Notwithstanding the foregoing it is a condition precedent that if the vessel is currently undergoing or may undergo major refit or repairs, alterations, remodeling or** *where hot work is being undertaken* **(other than soldering)** *or that the yard has requested a waiver of subrogation* **from the Owner or his Legal Representative(s),** *then prior agreement must be obtained from participating insurers hereunder.*
>
> Furthermore the Owner or his Legal Representative(s) must provide a copy of the current shipyards Ship Repairers Legal Liability insurance documentation and a full update or schedule of works being carried out during the period of this insurance and obtain Underwriters specific agreement (in writing).
>
> Underwriters participating hereon reserve their rights to amend the terms and conditions of this insurance and to charge an appropriate additional premium.
>
> **As above other than those that may be contained within the policy conditions, wordings and clauses to which this insurance is subject. Failure to comply with any such Condition Precedent may result in the cancellation of or denial of coverage under this policy**
>
> **Non compliance of any of the time frames stated above will, in normal circumstances, void this insurance, at the discretion of participating underwriters hereon.**

(Ex. I-315,325; Ex.J-376; Ex. K-427 (bolding in original, italics added).) Trafton admitted that after receiving the Cover Notes, he would review them, even if "only

_____

[1] While the 2011 Cover Note differed in form and title, it too was identical in substance.

3

the first few pages." (Ex. B1-234-235 at 482:13-483:3, Ex. B1-236 at 484:2-10, Ex. B1-237 at 486:22-24; Ex. L-473-474; Ex. I-312-363.)

Bear also admits that the August 28, 2013 Cover Note contains the following language under the bold-faced, capitalized heading **CONDITIONS PRECEDENT**:

> Please also take particular note of any conditions precedent that appears in the policy. If a condition precedent to the validity of this policy or commencement of the risk is not complied with, the insurer will not come on risk. If a condition precedent to the insurers liability under this policy is not complied with, the insurer will not be liable for the loss in question. A condition precedent may exist in the policy using other terminology and without reference to the words "condition precedent."

(Emphasis supplied.) (Ex. K-416, Ex. M-478 at ¶ 8; Ex. N-488 at ¶ 8.)

Before receiving the referenced three policies and Cover Notes, Marsh evaluated the conditions precedent and specifically warned Bear in writing of the consequences of failing to comply. In 2010, 2012, and 2013, Marsh provided Bear with the following policy wording analysis and warnings of lack of compliance:

| Transfer of Rights/Waiver of Subrogation | Insured MAY NOT waive rights of recovery from another party without underwriters prior agreement. |
|---|---|
| **Contractual Liability EXCLUSION**<br><br>We strongly recommend contacting our office and your maritime attorney before signing any contract to determine how the policy would or would not respond.<br><br><u>Comments</u><br>This refers to liability which the owner would <u>not</u> have in the absence of the contract or agreement. This exposure can come from clauses in the contract which requires the owner to indemnify and hold harmless the other party. Many contracts contain these clauses, whether the other party is a shipyard, marina, fueling company, docking facility etc. By agreeing to this type of contract, the owner assumes the other party's liabilities, even liabilities arising out of the other party's sole negligence. The contract may also call for the yacht owner to waive his rights of recovery (or subrogation) against the other. | Policy EXCLUDES any liability assumed under any contract or agreement. |

1816026v.1

| | | |
|---|---|---|
| | responsible, party. <u>Signing a contract with any or all of these stipulations renders the yacht owner financially responsible for the exposure without the benefit of insurance coverage.</u><br><br>**Yacht underwriters may be willing to delete or modify this exclusion in accordance to accommodate a specific contract. In order to consider this, underwriters require full details of the work including any hot work, a copy of the contract, and a certificate of insurance reflecting the liability limits carried by the shipyard or marina. If agreed by the yacht Underwriters, the elimination or modification of this exclusion will be subject to an additional premium.** | |
| | **Policy Conditions that Apply During Yard Periods** | Maintenance & Repair Clause:<br><br>**The clause applies whether the yacht is going to undertake, or if it is already undergoing yard work at the time policy becomes effective.**<br><br>The policy will remain in full force while a yacht is undergoing maintenance, repair of any part or replacement of any part *like for like*.<br><br>However, <u>**NO COVERAGE**</u> is provided in respect of refit, alteration, rebuild, remodeling, major repairs, any and all <u>hot work</u> other than soldering **OR** <u>where the yard has requested any waiver of subrogation</u>.<br><br>Prior to any coverage being provided, the insured must submit the following for underwriters specific agreement in writing:<br><br>Full details and schedule of work. Provide underwriters with a copy of the Ship Repair or Liability Insurance.<br><br><u>Non compliance of any of the timeframes stated above will, in normal circumstances, void the insurance, at the discretion of participating underwriters.</u><br>Underwriters reserve the right to amend the terms and conditions hereunder, and to charge the |

1816026v.1

Case No.  15-cv-0630-BTM(BLM)

| appropriate additional premium. |
| --- |

(Emphasis in original.) (Ex. O-504-507; Ex. P-528-529; Ex. Q-548-549; Ex. R-559; Ex. S-560; Ex. T-561-562; Ex. U-563; Ex. D-279-280 at 264:25-265:17, Ex. D-285-287 at 284:23-286:5; Ex. H-300-301 at 69:20-70:1.)

At deposition, Marsh agent Katie Harris Johnson testified that in November 2010, she discussed with Trafton and Jodsaas, the November 2010 Proposal which compared four different potential policies side by side in a chart format (with the information shown in the above chart), and reviewed it with Trafton and Jodsaas "page by page." ( Ex. D-267-268 at 154:19-155:18,Ex. D-269-270 at 157:7-158:10, Ex. D-273 at 245:11-18, Ex. D-273-274 at 245:24-246:6, Ex. D-274-276 at 246:21-248:7;  Ex. B1-225 at 446:6-22, Ex. B1-229 at 469:15-18; Ex. O-504-507; Ex. V-564; Ex. W-565-566). At his deposition, Trafton recalled having this telephone conversation with Johnson  (Ex. B1-229 at 469:8-18, Ex. B1-230 at 471:16-25.); reviewing documents about the proposed insurance and;  discussing with Jodsaas the different options available. (Ex. B1-223-224 at 428:15-429:20). Johnson made Jodsaas and Trafton aware of the stated conditions, and of the need to contact her in order to satisfy them (Ex. D-277-278 at 252:17-253:18, Ex. D-279 at 264:3-15), and Trafton admitted that he assumed he could notify Marsh if he needed to give notice to Underwriters. (Ex. B2-259 at 675:4-6.)

In 2011, 2012, and 2013, Bear expressly acknowledged in writing the important policy terms and conditions. The acknowledgement forms provided by Marsh to and signed by Bear stated the following:

### ACKNOWLEDGMENT FORM

### ACKNOWLEDGEMENT OF IMPORTANT POLICY TERMS AND CONDITIONS:

**Warranties**: On behalf of the named insured, I understand that the insurance policy(s) referenced above include Underwriter requirements and warranties that pertain to coverage. These warranties can include but are not limited to captain/crew, navigation limits, use of vessel and towing of other vessels. *The warranties have been explained to my satisfaction* and I understand

that the warranties may change over time. I have been told that the warranties may require me to take action with regard to the operation of a vessel and they also require me to contact my insurance broker, Marsh, and communicate information to the insurance company. *I also understand that a failure to comply with the terms of the warranty may void coverage*.

**Contractual liability**: On behalf of the named insured, I understand that the insurance policy(s) referenced above excludes any liability that I may assume or incur as a result of a contract entered into with a third party. *I have been counseled to contact Marsh and my maritime attorney prior to signing any contract or agreement such as with a shipyard, marina, fueling company, docking facility or any other entity that may seek to impose obligations or liability upon the yacht owner relating to the insured vessel. The yacht owner acknowledge that signing a contract that has an indemnification clause, hold harmless agreement, or waiver of subrogation will make the yacht owner financially responsible without the benefit of insurance*.

(Italics added, bold in original.) (Ex. X-567-568; Ex. Y-569-570.)[2] This form was received by Trafton, when it was forwarded to Jodsaas for signature, and returned to Trafton signed; yet Trafton testified that he never read it. (Ex. B1-231 at 479:15-480:8). Trafton agrees that Marsh recommended, up to five times in writing, that Bear contact either Marsh or its maritime attorney before signing a shipyard contract. (Ex. B1-233-234 at 481:13-482:12, Ex. B1-238-239 at 500:19-501:5,Ex. B1-240-241 at 506:19-507:3; Ex. Z-571-584).

The 2011, 2012 and 2013 Cover Notes and written communications from Marsh to Bear identified the Lloyd's Syndicates that were on the Bear risk, including their respective percentages of the risk. The Cover Notes even provide an address for the Syndicates where requisite notice and documentation to Underwriters could be sent, if physical mail proved to be the only method or notice available. (Exhibits I-312-363, J-364-414, and K-415-472.)  Marsh *repeatedly* warned of the consequences of lack of compliance with the warranties and exclusions. Bear's own expert Richard Masters conceded "[the warning] was in *every one* of their quotes and communications." (Ex. AA-588-589 at 116:24-117:7.) Similarly, Bear expert Jeffrey

---

[2] For reasons unknown, Marsh has not produced the Acknowledgement Form signed by Bear prior to the 2012-2013 policy period.

Posner testified that Marsh warned Bear "*more than ten times*" about the importance of compliance with these provisions. (Ex. BB-595 at 48:5-8.) Johnson's letter to Jodsaas stated, in relevant part:

> We are pleased to enclose the original and one copy of the captioned policies for "Polar Bear". . . .
> As highlighted on your Proposal and Confirmation of Coverage it is important to keep in mind the warranties and exclusions of the policy, especially those related to liabilities assumed under contract which are excluded unless approved by Underwriters beforehand. We strongly recommend contacting your maritime attorney and our office before signing any contracts with shipyards, marinas or any third party or vendor.
> . . . .
> Please do not hesitate to call if you have any questions or need additional information. You can reach me on my direct line at 954-765-5692, or toll free at 800-922-4866.

(Ex. E-293, F-294, and G-295.)

## B. The Events Leading to the Destruction of the *Polar Bear*

On May 4 or 5, 2014, the forward port stabilizer of the *Polar Bear* and its actuator failed during a voyage from Cabo San Lucas, Mexico to San Diego, California. (Ex. A-16 at ¶ 67; Ex. CC-600 at ¶ 8.) Without ever reporting this event to its broker or Underwriters (Ex. DD-622-623 at 172:16-173:6), Bear arranged for the *Polar Bear* to go to Marine Group Boat Works ("MGBW") in Chula Vista, California, to replace the defective forward port stabilizer and actuator during a haul out, inspection and repair. (Ex. M-478 at ¶ 9; Ex. N-490 at ¶19.) On the night of May 6, 2014, the *Polar Bear* was in transit to the entrance of the San Diego Harbor. (Ex. A-16 at ¶68.) The *Polar Bear's* captain and lookouts did not detect the presence of the Zuniga Jetty at the entrance to the harbor until the yacht rolled over it and was damaged. With the assistance of a boat tow service, the *Polar Bear* proceeded under its own power to MGBW for an immediate haul out. (Ex. M-478 at ¶ 10; Ex. N-489 at ¶ 10.)

On May 7, 2014, Bear signed a written contract with MGBW for haul out, block and launch with terms and conditions. (Ex. M-479 at ¶ 12; Ex. N-489 at ¶ 12.) Trafton signed the front page of the contract. (Ex. CC-600 at ¶¶ 7, 12, 13.), although,

he never read its reverse side, which contained clauses entitled "owners assumption of risk" and "owners exclusive remedy."[3] (Ex. B-214 at 134:7-19; Ex. CC-601-602 at ¶¶ 15, 16.) Not only did Bear fail to secure Underwriters' consent prior to signing the contract with MGBW, it did not even notify Underwriters of its intent to enter into the contract. (Ex. B2-259 at 675:7-18, Ex. B2-260 at 678:8-21.)

From May 22nd through June 10th, Bear and MGBW discussed and entered into work orders for major repairs for $189,000 which were incorporated into the May 7th contract. (Ex. M-479-481 at ¶¶11, 14, 19; Ex. N-489-490 at ¶¶11, 14, 19.) Again, Bear never notified Underwriters of its intent to enter these contracts, let alone secured Underwriters approval to do so.

In late May through mid-June 2014, the Polar Bear underwent repairs at MGBW. (Ex. M-481 at ¶ 21; Ex. N-490 at ¶ 21.) The Marine Hull policy of insurance was in place at the time, which required Underwriters to be notified. Bear *never notified* Underwriters of this repair work *before* it was undertaken, let alone secured Underwriters' consent to proceed with the repairs. (Ex. B2-251 at 639:6-23, Ex. B2-259 at 675:7-18, Ex. B2-260 at 678:8-21; (Ex. EE-628-633.) On the morning of June 19, 2014, nearly six weeks after arriving at MGBW, the *Polar Bear* caught fire during grinding or welding (Hot Work) of one of the portside steel inserts, and was engulfed by catastrophic fire. (Ex. M-481 at ¶ 22; Ex.N-490 at ¶ 22.)The next day, Bear communicated Notice of Loss to its U.S. insurance broker Marsh. (Ex. M-481 at ¶ 23; Ex. N-490 at ¶ 23.) During a number of phone calls between Bear and Marsh on June 20, 2014, *Bear admitted not providing any condition precedent notice to its broker or Underwriters.* (Ex. B2-252-253 at 640:6-641:2.) During the initial phone call, Trafton advised that the *Polar Bear* had run over a jetty, loosening the plate on the bottom of the yacht. (Ex. FF-634.) Bear had arranged for a haul out of

---

[3] Bear disputes it is bound to the conditions on the reverse side of the May 7, 2014 contract, claiming that Trafton did not know about their existence; however this issue is not material to the instant lawsuit.

the *Polar Bear* a month before the fire, and the vessel had been at MGBW undergoing work during this time. Trafton advised Marsh that Bear did not provide notice of the repair work, because Bear knew it was going to be under the deductible. (Ex. B2-252-253 at 640:6-641:2; Ex. DD-621-627.) In subsequent calls, Trafton again informed Marsh that there had been a grounding a month or so earlier and a plate had to be welded on the bottom of the yacht which was why the *Polar Bear* was in the yard. Trafton and Jodsaas admitted the repair contract and change orders were for upwards of $200,000 and included welding. (Ex. B-215 at 285:23-286:23, Ex. B-217 at 293:18-25; Ex. B-218-219 at 298:13-299:9; Ex. B2-250 at 638:14-19 ; Ex. H-304-305 at 92:23-93:3; Ex. GG-635.) The scope of the repair work included removing and replacing two sections of plating, which had already been underway at the time of the fire. (Ex. M-480 at ¶ 14, Ex. N-489 at ¶ 14.)

Trafton, on behalf of Bear, notified Marsh that Bear was making a claim for the total loss to the yacht. Significantly, however, Trafton *never notified Marsh that Bear was making a separate notice of claim or provided the receipted bills* for expenses stemming from the initial grounding as required by the Notice Of Loss and Filings of Proofs and Sue and Labor Clause. (Ex. FF-634; Ex. B2-253 at 641:3-7, Ex. B2-258 at 663:8-22). Bear also failed to notify Marsh and Underwriters pursuant to the conditions precedent of the initial planned haul out and repairs of the yacht actuators at the same boatyard contemplated and arranged in May of 2014. (Ex. EE-628-633; Ex. B2-248-249 at 633:8-634:2.)

Marsh, on Bear's behalf, reported the loss to Marsh's London broker Ropner, who, in turn, notified Underwriters on June 20, 2014. On June 26th Underwriters were informed that Bear had retained counsel (Hughes Dec., ¶ 2.) On June 30, 2014, Underwriters acknowledged Bear's notice of loss and requested information and documentation. (Ex. M-482 at ¶ 24; Ex.N-490 at ¶ 24.) Thereafter, Underwriters renewed their request for information and documentation from Bear; consulted with fire cause and origin and marine surveying consultants investigated the background

regarding the loss; inquired regarding the status of the Chula Vista Fire Department Fire Cause and Origin Investigation Report; obtained video tapes of the *Polar Bear* taken prior to and during the fire, sought documentation informally from relevant third parties; and attended site presentations with further visual and destructive testing of the *Polar Bear*. (Hughes Dec., ¶ 3.) On August 6, 2014, Underwriters issued its Reservation of Rights and Request For Information to Bear. (Ex. M-482 at ¶ 25; Ex. N-490 at ¶ 25.)

On October 23, 2014, Bear served its written notice of total loss to Marsh, acknowledging Trafton's June 20, 2014 telephonic reporting of the total loss and claim. The written notice advised that the *Polar Bear* was totally destroyed by fire while out of water undergoing repairs and the written notice was for the total loss. Importantly, *Bear's written notice of total loss did not include a notice of loss with expenditure receipts for the initial grounding and haul out related expense* as required under the Notice of Loss and Sue and Labor Clause in the policy. (Ex. HH-636-638.)

From August 6, 2014 to December 5, 2014, Underwriters continued to seek responses from Bear to their prior requests for information and documentation; consulted with fire cause and origin and marine surveyor consultants, issued requests to the Chula Vista Fire Department for the Fire Cause and Origin Investigation and Report; sought documents from third parties; and discussed entering into a tolling agreement to stay any legal dispute between Underwriters and Bear so that Bear could pursue third parties responsible for the fire. Bear's counsel preliminarily agreed to the tolling agreement proposal. (Hughes Dec., ¶ 4.)

On December 5, 2014, Bear responded to Underwriters' Request For Information and admitted that:

- No notice was given to and no prior agreement was obtained from Underwriters that the *Polar Bear* was undergoing major retrofit, repairs, alterations, or remodeling at MGBW.

11

- No notice was given to and no prior agreement was obtained from Underwriters for the hot work being undertaken on the *Polar Bear* at MGBW.

- No notice was given to and no prior agreement was obtained from Underwriters that MGBW had requested a waiver of subrogation from the Owner or his Legal Representative[s].

- MGBW Ship Repairer's Legal Liability insurance documentation was not provided to Underwriters and Bear did not obtain Underwriters' prior specific agreement in writing.

- Bear did not provide Underwriters a full update or schedule of works being carried out on the *Polar Bear* at MGBW and Bear did not obtain Underwriters' prior specific agreement in writing to proceed with that work. (Ex. EE-628-633.)

Upon receipt of Bear's response to Underwriters request for information, Underwriters continued to follow up on the preliminary agreement to enter into a tolling agreement and stay of proceedings between Underwriters and Bear and the status of the Chula Vista Fire Department Fire Cause and Origin Investigation and Report. Bear ultimately declined Underwriters' offer of a tolling agreement. (Hughes Dec., ¶5.) After further investigation, Underwriters concluded that the loss of the *Polar Bear* was not covered, and on March 20, 2015, Underwriters issued its Disclaimer of Coverage to Bear. (Ex. M-483 at ¶ 27; Ex.N-490 at ¶ 27.)

## C.   The Sue and Labor Clause in the Cover Note

In its Counterclaim, Bear has charged Underwriters with two distinct breaches of obligations: First, Bear has alleged the declination of coverage for the $17.250M total loss, as addressed above; Second, Bear claims that Underwriters failed to pay expenses of $14,407.50 for safeguarding the *Polar Bear* under the Policy's Sue and Labor Clause. (Ex. A-passim; Ex. II-639-644.) The Cover Notes and communications between Marsh and Bear notified Bear of the terms and conditions

for safeguarding and mitigating damage to the yacht along with Notice of Loss and Filing of Proof requirements. The 2011, 2012 and 2013 Cover Notes contain the following wording.

> **NOTICE OF LOSS AND FILING OF PROOF**
>
> It is agreed by the Assured to report immediately to the Assurers or to the representative who shall have issued this Policy every occurrence which may become a claim under this Policy and shall also file with the Assurers or their representative, a detailed sworn proof of loss and proof of interest and/or receipted bills in case of a partial loss, within ninety (90) days from the date of loss.
>
> **SUE AND LABOR CLAUSE**
>
> And in case of any loss or misfortune, it shall be lawful and necessary for the Assured, their factors, servants and assigns, to sue, labor and travel for, in and about the defense, safeguard and recovery of the said yacht or any part thereof, without prejudice to this insurance; the charges whereof we, the Assurers, will pay.

(Emphasis in Original; Ex.'s I-328, 336, J-381, 387, K-433, 439 .)

This is an Admiralty and Maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure, which Bear does not dispute. (Ex. CC-599 at ¶ 1.)

## III.  SUMMARY JUDGMENT STANDARD

Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrell*, 477 U.S. 317 (1986).

## IV.  LEGAL ARGUMENT

### A.  Choice Of Law Analysis

As this dispute concerns the terms of a marine insurance contract between parties domiciled in different jurisdictions, it is appropriate to consider choice of law. It is well established that the first point of inquiry is in maritime law: "The parties agree that the policy at issue here is a maritime contract. Because this case involves a marine insurance contract, it invokes federal admiralty jurisdiction.

Thus, if there is a well-established federal admiralty rule, that rule governs this case. *Wilburn v. Fireman's Fund Ins. Co.,* 348 U.S. 310, 316-21, 1955 AMC 467, 472-77 (1955). If there is no such rule, then state law governs the interpretation of this contract. *Id.* Thus, the Court first considers whether there is a controlling admiralty rule."

 *Meridian Textiles v. Indemnity Insurance Co. of North America*, F. Supp. 2d 611 (CD Cal 2008).

As a general rule, courts "apply state law unless an established federal rule address[es] the issues raised or there [is] a need for uniformity in admiralty practice." *Yu v. Albany Ins. Co.*, 281 F. 3d 803, 808 (9th Cir. 2002); *Kiernan v. Zurich Cos.*, 150 F.3d 1120, 1121 (9th Cir. 1998). Bear agrees that this is an Admiralty and Maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. (Ex. A-2 at ¶¶ 5, 6; Ex. M-475 at ¶1; Ex. N-487 at ¶1; Ex. CC-599 at ¶ 1.) To ensure uniform interpretation of marine insurance policies, Bear's policy needs to be construed in accordance with prevailing principles of admiralty and maritime law.

It is undisputed that Delaware law governs any disputes arising out of Bear's policy. (Ex. M-475-486.) Further, absent any contrary Delaware law concerning the issues of maritime contract interpretation discussed below, and in light of the body of maritime case law dealing with these issues, admiralty and maritime law will control. *Yu, Supra*. As demonstrated below, well-established principles of admiralty compel the conclusion that Bear's failure to satisfy the Policy's conditions precedents provides Underwriters with a complete defense to Bear's claim for coverage. Even with a controlling rule of maritime law, the law of Delaware if applied would lead to the same outcome. *AES Puerto Rico, L.P. v. Alstrom Power, Inc.*, 429 F. Supp. 2d 713, 717 (D. DE. 2006).

1816026v.1

### B.   Total Loss Coverage is Void Because Bear Breached Multiple Conditions Precedent in the Policy

#### 1.   Maritime Insurance Policies are Strictly Interpreted

Federal courts have consistently held that an insured's breach of warranties[4] in a marine insurance policy- such as the conditions precedents at issue here- voids coverage, even if compliance with the warranty would not have avoided the loss. *Lexington Ins. Co. v. Cooke's Seafood*, 835 F.2d 1364, 1366 (11th Cir. 1988). Delaware is in accord. *AES Puerto Rico, supra* at 717.

The Ninth Circuit recently considered the enforceability of "warranties" in marine insurance contracts. *Guam Indus. Servs., Inc. v. Zurich Am. Ins. Co.*, 787 F.3d 1001 (9th Cir. 2015). In *Guam*, the Ninth Circuit affirmed summary judgment in favor of an insurer finding that the policy holder had breached a warranty in the marine insurance policy and thus coverage was void. The policy at issue provided coverage for a dry dock owned and operated by the policy holder, so long as the owner obtained and maintained "Navy Certification" for the dry dock, the highest certification in the industry. *Id*. at 1003. It was undisputed that the dry dock owner only obtained a lesser "commercial" certification, which had expired when a storm hit and caused the dry dock to sink. *Id*. The district court granted summary judgment to the insurer declaring that no coverage was afforded for the loss of the dry dock due to the failure to comply with the warranty. *Id*. at 1004.

The Ninth Circuit noted that "admiralty law requires the strict construction of express warranties in marine insurance contracts; breach of the express warranty by the insured releases the insurance company from liability even if compliance with the warranty would not have avoided the loss." *Id*. at 1005, citing *Lexington, supra*, 835 F.2d at 1366.

---

[4] Despite the differing terminology, "warranties" as discussed by the relevant case law are equivalent to the "conditions precedent" in the present case, as each has the same effect of requiring continuous compliance with a stated term or else coverage is void.

The *Guam* Court found that the policy holder's undisputed failure to maintain at least commercial certification for the dry dock violated the warranty, even though the lack of such certification did not actually contribute to the loss: "[T]he law requires strict compliance with marine insurance policy warranties, even when the breach of the warranty did not cause the loss." *Guam Indus., supra*, at 1005.

*Guam* is in accord with other federal courts that have reached the same conclusion concerning the enforceability of warranties in marine insurance policies. *Lexington Ins. Co. v. Cooke's Seafood*, 835 F.2d 1364, 1366 (11th Cir. 1988)( no coverage when the insured vessel traveled outside the geographical limit that had been established as a "navigation warranty"); *Aguirre v. Citizens Cas. Co. of NY*, 441 F.2d 141 (5th Cir.), *cert. denied*, 404 U.S. 829 (1971)( coverage void for failure to keep vessel seaworthy pursuant to express warranty in policy).

Bear admits in its Answer that it has not satisfied multiple conditions precedent necessary for coverage under the policy, a fact, which in the opinion of Bear expert Richard Masters at least threatened the existence of coverage under the policy (Ex. AA-590 at 153:5-10). Such admissions "are considered judicial admissions conclusively binding on the party who made them." *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988) ("Judicial admissions are formal admissions in the pleadings which have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact.") (citations omitted.)

The conditions precedent requiring notice that the *Polar Bear* was to undergo a major refit, repair, or any 'hot work' were unambiguous. (Ex. K-427 at p. 13.) Bear had the requisite knowledge and sufficient time to notify Underwriters of the major repairs prior to the catastrophic fire on June 19, 2014, and has admitted that it deliberately and intentionally failed to do so. (Ex. EE-628-633.) Bear admitted that the marine surveyor stated that welding and/or grinding (i.e. Hot Work) was required to remove and insert new hull plates due to the substantial damage (Ex. N-489 at ¶ 14), and that it did not provide such notice to Underwriters. (Ex. EE-628-633.) It was

not unreasonable for Underwriters to require an opportunity to assess the increased risks of catastrophe due to the welding and grinding the hull which was beyond the risks associated with normal usage of the *Polar Bear*.

Similarly, the condition precedent requiring notice to Underwriters that MGBW had requested a waiver of subrogation from Bear was unambiguous. (Ex. K-427 at p. 13.) Bear has admitted that no such notice had been provided. (Ex. EE-628-633.) The location of the subrogation waiver on the reverse side of the May 7th contract is irrelevant, as Bear's agent and manager Trafton did not act in an objectively reasonable manner to acquaint himself with the contents of the written agreement before signing it. Bear had sufficient time to inquire, investigate and obtain the complete Contract and to notify Underwriters that the yard had requested a waiver of subrogation prior to the fire. Had Bear complied with the conditions precedent and notified Underwriters the Polar Bear was undergoing major repairs, then Underwriters would have demanded complete copies of all contract documents, thus revealing the waiver of subrogation. (Ex. JJ-646-648 at 194:23-196:21.)

The conditions precedent requiring Bear to provide Underwriters with MGBW's Ship Repairers Legal Liability Insurance documentation as well as a full update or schedule of works being carried out on the *Polar Bear* were equally unambiguous. (Ex. K-427 at p. 13.) It was reasonable for Underwriters to request the insurance documentation in order to be able to evaluate MGBW's ability to cover damage suffered to the *Polar Bear* directly or indirectly caused by the repairs. The schedule of works would have provided Underwriters the opportunity to engage and aid in preventing damage to the *Polar Bear*. Bear denied Underwriters this opportunity by not providing such schedule or updates. (Ex. EE-628-633.)

The condition precedent requiring Bear to obtain Underwriters written agreement regarding the proposed work was also unambiguous and reasonable (Ex. K-427 at p. 13.), Its purpose was to reserve Underwriters' rights to amend the terms and conditions of the insurance and to charge an appropriate additional premium, as

17

the major repairs constituted a new underwriting risk beyond what is normally associated with *Polar Bear* while under navigation or at port.

Bear breached multiple conditions precedent in its policy by not providing Underwriters with adequate notice of the work to be done, not entering into an agreement with Underwriters concerning the proposed work, and not providing certain relevant documents from MGBW (where the work was to take place). The policy clearly states that failure to satisfy the conditions precedent will result in loss of coverage, and maritime law contracts are to be strictly enforced. Under controlling federal admiralty law, Bear's breach of the conditions precedent voids coverage under the policy. Accordingly, Underwriters are entitled to summary judgment as a matter of law.

### 2. Whether the Loss Was Caused by, or Related to, the Breach of the Condition Precedent is Irrelevant

Any argument that Bear's breach of the conditions precedent can be excused due to the lack of causal connection between the breach and the loss of the *Polar Bear* is meritless. It is well-settled that non-compliance with conditions precedent to liability under a contract of marine insurance, as described above, affords a complete defense to the insurer *irrespective of any question of causation*. In *Guam*, the Ninth Circuit unambiguously declared: "[w]e conclude that the law requires strict compliance with marine insurance policy warranties, *even when the breach of the warranty did not cause the loss*." *Guam, supra*, at 1005 (emphasis supplied). Similarly, the Fifth Circuit in *Aguirre, supra*, held that once a breach of the express warranty automatically suspended coverage under the policy, the question of whether the breach proximately caused the damage was moot. Here, as in *Guam* and *Aguirre*, the court need not undertake such an analysis; whether the destruction of the *Polar Bear* resulted from the repair work that was required to be disclosed to Underwriters prior to commencement is irrelevant to the fact that Bear failed to comply with the condition precedent.

## C.    Bear had Notice of the Existence of the Conditions Precedent

Bear admits it received a copy of the August 28, 2013 Cover Note, which included clear references to conditions precedent. (Ex.M-478 at ¶¶ 7, 8; Ex. N-488 at ¶¶7, 8.) It cannot be disputed Bear was on notice of the existence of such conditions at the time of the incident.

Moreover, Bear received two previous Cover Notes with nearly identical language related to the conditions precedent on September 6, 2011 and September 5, 2012. The August 28, 2013 Cover Note even includes a dedicated paragraph on page 2, advising Bear to "*please also take particular note of any conditions precedent* that appear in the policy. *If a condition precedent* to the validity of this policy or the commencement of the risk *is not complied with, the insurer will not come on risk*." (Emphasis supplied) (Ex. K-416 at p. 2.) Bear admits it received this Note. (Ex. N-488 at ¶¶ 7, 8.)

The November 1, 2010 Marsh Yacht Insurance Proposal also contained side-by-side comparison of policies from four different insurers, including a comparison of the Conditions Precedent at issue. (Ex. O-495-518.) Marsh's August 20, 2012 Yacht Insurance Proposal contained a similar chart with similar mention of the subject Conditions Precedent; as did the August 20, 2013 Yacht Insurance Proposal. (Ex. P-519-538; Ex. Q-539-558.) Indeed, Bear expert Jeffrey Posner testified that Marsh warned Bear "more than ten times" about the importance of compliance with the Conditions Precedent. (Ex. BB-594 at 48:5-8.) On August 21, 2012, Jodsaas indicated that the 2012 Yacht Insurance Proposal was "approved." (Ex. T-561-562.)

Bear, via Trafton, submitted to Marsh signed "Acknowledgement Forms" dated August 23, 2011 and August 22, 2013. (Ex. X-567-568; Ex. Y-569-570.) These signed forms confirm Bear's understanding (via Trafton) that "*I have been told that the warranties might require me to take action* with regard to the operation of a vessel and they *also require me to contact my insurance broker*, Marsh, and communicate information to the insurance company. *I also understand that a failure*

19

*to comply with the terms of the warranty may void coverage*." (Emphasis supplied) (Ex. X-567-568, Y-569-570.) Simply put, the overwhelming evidence confirms Bear was aware of the conditions precedent.

The consequences of failing to comply with the conditions precedent were equally as clear. Under the paragraph with the bold-faced, capitalized heading **CONDITIONS PRECEDENT**, Bear was clearly warned to take particular note of any conditions precedent that appear in the policy. (Ex. K-416 at p. 2.) The Cover Note further warned that if a condition precedent was not satisfied, the insurer would not come on risk and would not be liable for the loss in question: "If a condition precedent to the validity of this policy or the commencement of the risk is not complied with, the insurer *will not* come on risk." *Id.* (emphasis supplied.) The wording also notified Bear that conditions precedent may exist in the policy using other terminology and without reference to the words "conditions precedent." *Id.* This Cover Note wording demonstrates that Bear was on notice that the policy contained conditions precedent that would affect the availability of coverage if they were not satisfied. Further, the wording in the Cover Note and insurance policy was conspicuous based on the wording of the individual, discreet conditions precedent, and headings of "**CONDITIONS PRECEDENT**" in bold-faced, capitalized type.

### 1. Bear Knew How to Satisfy the Conditions Precedent

Bear argues it should be excused from its admitted failure to satisfy the the conditions precedent because the policy did not adequately explain how it was to do so. (Ex. A-15 at ¶ 63.) This argument fails for several reasons. First, Trafton admitted that he knew he needed to notify Marsh if he needed to give notice to Underwriters. ( Ex. B2-254 at 644:6-22; Ex. B2-255 at 645:2-11, 16-20; Ex. B2-255-256 at 645:23-646:10; Ex. B2-256-257 at 646:18-647:2, 7-23; Ex. B2-259 at 675:4-6.) Marsh warned Jodsaas and Trafton to contact Johnson prior to any yard visit or signing a repair contract regarding any warranty or exclusion in the policy as they were putting themselves at risk. (Ex. D-277-278 at 252:17 – 253:15; Ex. E-293.) Jodsaas admitted

he was told to contact his insurance broker Marsh to communicate information to the insurance company regarding actions to be taken in regards to Underwriters requirements and warranties that pertain to coverage. (Ex. X-567-568; Ex. Y-569-570.) Further, the August 28, 2013 Cover Note has bold-faced telephone and facsimile numbers and an email address at the top of the first page for the London broker, Ropner. Page seventeen of the Cover Note provides an additional address to contact the underwriting entities directly: "The business address of each member is Lloyd's, One Lime Street, London EC3M 7HA." Regardless, there is no evidence Bear *ever* made any effort to contact Underwriters or Ropner prior to initiating the hot work or major repairs. At a minimum, a reasonably prudent insured in Bear's position would have contacted its own broker and made some reasonable attempt to reach out to its insurer. There is also no evidence that Bear's failure to comply with the conditions precedent was due to its ignorance of whom to contact. Rather, Bear admits failure to contact its broker or Underwriters was a deliberate and intentional decision.

Bear further alleges the policy is ambiguous because it does not define what constitutes a "major" repair. (Ex. A-31 at ¶ 128a.) This argument is groundless. Jodsaas had appointed Trafton as Bear's agent and manager for overall responsibility for the Yacht including policy requirements. (Ex. B2-261-262 at 679:5-680:23.) Trafton admitted the proposed repairs to the vessel were considered major. (Ex. B1-226-228 at 465:17-467:9.) Jodsaas testified regarding the scope and cost of $189,000 (Ex. H-298-299 at 66:20-67:5,11-14; Ex. H-303-304 at 91:23-92:1,19-20; Ex. H-306 at 111:12-20; Ex. H-307-308 at 112:13-113:2; Ex. H-309 at 116:4-18). It strains credulity to suggest that welding and grinding of the steel hull and other repairs at a cost of $189,000 was anything but "major." Bear failed to comply with the conditions precedent not because of any ambiguity but due to their deliberate and intentional decision not to report the repairs to Underwriters because of the belief the repairs were under the policy deductible. Further, Bear does not allege the other

conditions precedent relating to Hot Work, yard's liability insurance policy, yard requested waiver of subrogation, and/or schedule of work were ambiguous. Thus, any ambiguity with respect to what constitutes a "major repair" was not a contributing reason to Bear's decision to not contact Marsh (or Underwriters).

The undisputed facts confirm that Bear knew how to comply with the conditions precedent, and any argument to the contrary is unsupportable.

### 2.    Marsh is not Underwriters' Agent

Bear initially admitted that it had not provided notice of its yard visit prior to the fire, yet after receiving Marsh's computer notes in discovery, is now claiming that Jodsaas did alert Marsh as to the work being done at MGBW. (Ex. KK-653.) Regardless of the accuracy of this statement, it is irrelevant, as Marsh is not – and has never been – an agent of Underwriters. Marsh told Jodsaas and Trafton to contact Johnson in order to satisfy the warranties in the policy because they were an additional exposure that put Bear at risk (Ex. D-277-278 at 252:17 – 253:18.) Jodsaas admitted signing the Marsh acknowledgement form that he had been told to contact his insurance broker Marsh to communicate information to the insurance company regarding actions to be taken in regards to Underwriters requirements and warranties that pertain to coverage. (Ex. X-567-568; Ex. Y-569-570.) Marsh warned Jodsaas and Trafton to contact Johnson before signing any contract because warranties and exclusions in the policy including liability assumed under contract were excluded unless approved by Underwriters beforehand. (Ex. E-293, F-294, and G-295.) Trafton admitted if the yacht was undergoing a yard visit he would notify Marsh to give notice to Underwriters. (Ex. B2-259 at 675: 4-6.) In his conversation with Marsh claims representative Savage, Trafton told Savage they did not contact their broker Johnson because they knew the repair was going to be under the deductible. (Ex. FF-634.)

Marsh did not act on behalf of Underwriters; it was solely the broker acting on behalf of its client, Bear. In the 2010 Yacht Insurance Proposal (Ex. O-495-518),

Marsh presented the quotes it obtained for insuring *POLAR BEAR* from four different insurers to its client Bear. In the Yacht Insurance Proposals, Marsh informed Bear that Marsh would be its claims advocate wherein Marsh's in-house Yacht Claims professional would work on "our clients" behalf to provide efficient and effective claims resolution after a loss. (Ex. P-519-538, Q-539-558; Ex. NN-679 at 21:13-22; Ex. NN-680 at 22:9-12; Ex. NN-680-681 at 22:17-23:6, 11-13; Ex. NN-682 at 123:7-9, 11-16; Ex. NN-683-684 at 124:3-125:12.) In the event a Marsh client wished to provide notice of occurrence or claim to an insurer, Marsh reports claims and occurrences to insurers in order to preserve its clients' rights under the policy and handles claims for their clients. (Ex. LL-669.) Marsh itself admits it is not authorized by Underwriters to accept Notices of Occurrence or Claim on Underwriters behalf. (Ex. MM-672-673 at 63:20 – 64:6; Ex. NN-685 at 137:5-19.) Underwriters testified that notice to Marsh was not notice to Underwriters. (Ex. OO-691-692 at115:18 - 116:3.) Bear's own expert admits there is no evidence that Underwriters authorized Marsh to receive Notice of Claims or investigate claims on its behalf. (Ex. AA-586-587 at 36: 22 – 37:2.) Marsh's expert testified that: "In my experience, when we have a claim, we immediately get all of the necessary information, *let our Lloyd's broker know, who then reports*." (Emphasis supplied.) (Ex. DD-624 at191:18-21.) Indeed, Bear is suing Marsh for breach of contract, breach of fiduciary duties, and negligence due to Marsh's duties to Bear as Bear's agent to report Notice of Occurrence, Notice of Claim, and notices and documentations required under the conditions precedent to Marsh's subagent Ropner to report these matters to Underwriters. (Ex. A-23 at ¶ 93, Ex. A-47 at 166, Ex. A-49 at 172(k-l), and Ex. A-50 at 176-178.) In the context of marine insurance, a broker acts as the agent for the insured and not Underwriters. *Certain Underwriters at Lloyd's, London v. Giroire* 27 F. Supp. 2d 1306 (1998). Delaware is in accord. *National Fire Ins. Co. of Hartford v. Eastern Shore Laboratories, Inc.*, 301 A. 2d 526, 529-530).

1816026v.1

### D.  Bear's Counterclaims Fail as a Matter of Law

As it clearly violated the express conditions precedent contained in the policy, Bear cannot argue Underwriters acted in bad faith. Other courts in the Ninth Circuit have granted summary judgment to a marine insurance carrier when the insured clearly violated conditions precedent within the policy. *See, e.g., Pac. Employers Ins. Co. v. Sealaska Timber Co.*, Adm. No. C87-963C, 1993 A.M.C. 350 (W.D. Wash., May 6, 1988); noting an insured's failure to satisfy a condition precedent excuses the insurer from its performance under the policy; summary judgment granted. A California court reached a similar conclusion: once an insured is found to have violated the terms of the policy, the policy is void <u>ab initio</u>. *LA Sound USA, Inc. v. St. Paul Fire & Marine Ins. Co.*, 156 Cal. App. 4th 1259, 1266 (2007), citing *Imperial Cas. & Indem. Co. v. Sogomonian*, 198 Cal. App. 3d 169, 184 (1988) ("When a policy is void ab initio, it is 'as though it had never existed.'") If the policy never existed, no grounds can exist on which the insured may pursue claims for the insurer's alleged breach of the policy, including claims for breach of contract and breach of the implied covenant of good faith and fair dealing. Here, Bear has breached the unambiguous conditions precedent in its policy, rendering the policy void. It cannot  now claim Underwriters' denial of coverage breached a duty under a voided policy.

Bear alleges breach of contract by Underwriters in "repudiating their obligations under the Cover Note to pay for the loss." For the reasons described above, Underwriters' obligation to provide coverage ceased when Bear undertook its repairs without any notice to Underwriters. Consequently, for the same reasons that Underwriters is entitled to summary judgment on its claim for declaratory relief, it is also entitled to summary judgment on Bear's counterclaim for breach of contract.

For fifteen months after the *Polar Bear* was destroyed by fire on June 19, 2014, Bear never submitted a notice of claim for the initial grounding with receipted bills for the costs to safeguard the yacht from further damage. Bear first referenced a

claim for reimbursement of these costs under the Sue and Labor Clause in its (First) Amended Counterclaim, filed on September 24, 2015. (Ex. PP-696-837; Ex.M-482 at ¶ 25.) Bear has not submitted any other notice or formal claim under the Sue and Labor Clause; the only claim is contained within the pleadings in this litigation. Underwriters does not dispute the enforceability of the Sue and Labor Clause, and even recognizes Bear might have had some expenses that would have been considered recoverable. However, until the filing of the Amended Counterclaim in September 2015, Bear had not sought recovery of those expenses. The August 28, 2013 Cover Note explicitly says, in the Notice Of Loss And Filing Of Proof clause, that Bear was to submit "a detailed sworn proof of loss and proof of interest and/or receipted bills in case of a partial loss, within ninety (90) days from date of loss." It is undisputed that Bear did not do so here. Underwriters could not have denied a claim that was *never made*, and, without receipted bills, could not have paid a claim under the Sue and Labor Clause.

Bear admits that it: a) deliberately and intentionally failed to comply with the conditions precedent; and b) did not provide the requisite Notice of Claim and receipted bills under the Sue and Labor clause until July 15, 2016. Underwriters properly denied coverage.

## V. **CONCLUSION**

For the foregoing reasons, it is respectfully submitted that this Court should grant Underwriters' Motion for Summary Judgment or in the Alternative, Summary Adjudication as to claims and/or defenses on its First Amended Complaint and on Bear's Second Amended Counterclaim, finding there is no coverage.

Dated: July 29, 2016

**WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP**

By: */s/ Peter M. Hughes*
Peter M. Hughes, Esq.
Attorneys for Plaintiff / Counter-Defendant

25

Case No. 15-cv-0630-BTM(BLM)