```
 1  WRIGHT, L'ESTRANGE & ERGASTOLO
      William E. Dysart (SBN 042608)
 2    wedysart@wlelaw.com
      Robert C. Wright (SBN 051864)
 3    rwright@wlelaw.com
      Andrew E. Schouten (SBN 263684)
 4    aschouten@wlelaw.com
    402 West Broadway, Suite 1800
 5  San Diego, California 92101
    (619) 231-4844
 6  (619) 231-6710 (Facsimile)

 7  Attorneys for Defendant, Counterclaimant
    and Third-Party Plaintiff BEAR, LLC
 8
```

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CERTAIN INTERESTED UNDERWRITERS AT LLOYD'S, LONDON,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>BEAR, LLC, a Delaware Limited Liability Company, and DOES 1 through 50,<br><br>　　　　Defendants.<br><br>BEAR, LLC, a Delaware Limited Liability Company,<br><br>　　　　Counterclaimant,<br><br>　v.<br><br>CERTAIN INTERESTED UNDERWRITERS AT LLOYD'S, LONDON,<br><br>　　　　Counter-Defendant,<br><br>　and<br><br>MARSH USA, INC., a Delaware corporation,<br><br>　　　　Third-Party Defendant. | CASE NO. 3:15-cv-00630-BTM (BLM)<br><br>**IN ADMIRALTY**<br><br>**DECLARATION OF MICHAEL T. FITZGERALD IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT BY LLOYD'S, LONDON AND MARSH USA, INC.**<br><br>Date:　　　September 23, 2016<br>Time:　　　11:00 a.m.<br>Courtroom: 15B (15th Fl.-Carter/Keep)<br>Judge:　　Hon. Barry Ted Moskowitz<br><br>Complaint filed: March 20, 2015<br><br>**NO ORAL ARGUMENT UNLESS REQUESTED BY THE COURT** |

Michael T. Fitzgerald declares:

1. I was previously retained by Bear, LLC ("Bear") as a marine insurance expert in connection with the claims being asserted in this case by Certain Interested Underwriters at Lloyd's, London ("Underwriters"), Marsh USA, Inc. ("Marsh"), and Bear. I prepared an Expert Report dated March 30, 2016, and a Supplement to Expert Report dated May 21, 2016, and gave a deposition on June 13, 2016.

2. I have personal knowledge of the matters contained in this declaration. If called and sworn as a witness, I would and could testify competently and from first-hand knowledge as to the matters contained in this declaration. Based on my training, experience, and work in this case, I am prepared to offer opinions at trial consistent with those expressed in this declaration.

## QUALIFICATIONS

3. I have more than 35 years of experience in the wet marine insurance industry. My experience is principally in Ocean Cargo, Hull & Machinery ("Hull"), Protection & Indemnity ("P&I") and Marine Liabilities. I also have extensive experience handling marine claims, including large and/or difficult claims.

4. As a marine broker, I designed, marketed and serviced Builder's Risks, Ship Repairers, Charterer's, Wharfinger's/Landing Owner's, Bumbershoots, Offshore Packages, and Freight Forwarder coverages which include Air Cargo Legal, NVOCC, Warehousemen's Liability and Freight Forwarder's E&O insurance.

5. My first position was as a marine specialist with Johnson & Higgins ("J&H") in Minneapolis, which I joined in 1975. In 1978, I joined Marsh & McLennan's ("M&M") Dallas, Texas, office as a Marine Manager and was named Assistant Vice-President in 1980 and Vice-President in 1982. While with M&M

(now Marsh USA, Inc.), I serviced all wet marine placements for the Dallas office. In 1997, I joined Credit General Insurance Company as Marine Manager and Underwriter handling a book of business consisting principally of Texas and Louisiana offshore energy industry support vessel accounts as well as West Coast fishing vessels.

6. While at J&H in Minneapolis, Minnesota, I worked on claims (Hull, P&I and Cargo) for Aiple Towing and monitored the claims recovery efforts of Lord, Bissel & Brook, Chicago, on Aiple's behalf. I also handled cargo claims for Minnesota, Mining & Manufacturing (3M), General Mills and International Multifoods among others. During my employment with Marsh in Dallas, Texas, I had direct dealings with many clients on wet marine insurance coverages, including placement of yacht policies.

7. I joined Robert Hughes Associates, Inc., 508 Twilight Trail, Suite 200, Richardson, Texas 75080, in 1999 as a Wet Marine insurance coverage expert for Ocean Cargo, Hull, P&I, Yachts, Primary and Excess Marine Liabilities, Marinas, Docks & Piers, and Boat Dealers.

8. Since 2000, I have also worked for Allianz Global Corporate & Specialty as a wet marine senior underwriter.

9. While working for M&M Dallas, I held a Texas insurance license.

10. I have been retained as an expert about 15 times in insurance-related cases over the last 15 years.

11. I studied at Macalester College in St. Paul, Minnesota, receiving a Bachelor's of Arts degree in economics.

12. During my more than 35 years of experience in the marine insurance industry, I have dealt extensively with Lloyd's, London ("Lloyd's") underwriters, placed numerous insurance policies through Lloyd's brokers into the London Marine Market, and have extensive experience in handling marine claims made to underwriters.

## WORK IN CASE

13. My work in this case to date includes review of the following documents:

- Final deposition transcript of Kathleen Johnson ("Johnson"), dated January 7, 2016;
- Documents produced on February 5, 2016, by Marsh to Bear (Bates Nos. MARSH0002330-2508);
- Documents produced on February 12, 2016, by Marsh to Bear (Bates Nos. MARSH0002485-2843);
- Final deposition transcript with exhibits of Debbie Philibert, dated March 2, 2016;
- August 10, 2010 notice form Ropner-Ropner Yacht Team launches ship repairers' liability insurance;
- Final deposition transcript with exhibits of Patrice Grossinger, dated March 2, 2016;
- Final deposition transcript with exhibits of Jason Stephenson, dated March 3, 2016;
- Final deposition transcript with exhibits of Roger Trafton, Volume III, dated January 27, 2016.
- Final deposition transcript with exhibits of Jeffrey Posner, dated June 14, 2016.
- Final deposition transcript with exhibits of Richard Masters, dated June 15, 2016.
- Final deposition transcript with exhibits of Nicholas Charles Smith, dated June 29, 2016.
- Bates Nos. Marsh0002194-2196 (Chubb's Hull Only quote)

## OPINIONS

14. Based on my review of the case to date, and my over 35 years of experience in the wet marine insurance industry, I have the following opinions:

### Communication with Lloyd's Underwriters

15. The lines of communication when placing insurance coverage with underwriters at Lloyd's for a risk located in the United States involves a minimum of four (4) parties, namely:

- The U.S. Assured.
- The U.S. Assured's U.S. Broker.
- A Lloyd's, London Broker.
- Lloyd's, Underwriters.

16. For information originating from the U.S. Assured to be communicated to the involved Lloyd's underwriters, the established lines of communication are from the U.S. Assured - to the U.S. Broker - to the Lloyd's Broker - to the Lloyd's underwriters.

17. The U.S. Assured and the involved Lloyd's underwriters never communicate with each other directly. As supported by Mr. Jason Stephenson, an employee of a lead underwriter at Lloyd's in his deposition of March 3, 2016:

- "I deal directly with the London broker, Ropner" (p. 139, lines 20 & 21).
- "That's correct, I've never dealt directly with Marsh" (p. 140, lines 12 & 13).
- Question: "It is agreed by the assured to report immediately to the assurers or their representatives. And do you understand what is meant by 'representative' there?"
  Answer: "Well, representative could be a Lloyd's broker or, indeed, it could be the producing agents. . . . (p. 117, lines 15 through 24).

In my experience, it would be extremely rare for a Lloyd's underwriter to communicate directly with a U.S. Broker or U.S. Assured. Accordingly, in the event of a claim or a potential claim, it is the standard custom and practice in the insurance industry for a U.S. Assured to satisfy his obligation of providing notice of loss under a Cover Note and/or a policy, or to provide a notice of an occurrence that might give rise to a loss, by notifying the U.S. broker who sold the Cover Note or policy.

### Maintenance and Repair Clause

18. The Maintenance and Repair Clause contained in the August 26, 2013 Cover Note, includes an exclusion for major repairs and hot work. In my experience, such an exclusion is not commonly found in yacht hull insurance policies. In Lloyd's expert Nicholas Smith's deposition he said he was aware of two (2) and only two (2) yacht marine markets that had incorporated the "Maintenance and Repair Clause" into their yacht policy form. I have not received nor have I been able to locate either of the two (2) alleged forms. In an attempt to locate said forms I have accessed the American Institute of Marine Underwriters (AIMU) website (aimu.org) list of approved forms which includes a limited number of London Institute approved forms. Maintenance and Repair Clause does not appear in the AIMU approved forms list. I also checked the Witherby Insurance website (witherbyinsurance.com) and reviewed the contents of Reference Book of Marine Insurance Clauses, 78th Edition and I did not find a "Maintenance and Repair Clause" listed among the approved London Institute clauses/forms. It appears the "Maintenance and Repair Clause" has not been submitted, vetted and approved by either the London Institute or AIMU.

19. In November 2010 while the Yacht was still under construction, Marsh provided Bear (The Assured) with side by side quotes from four (4) yacht markets, a true and correct copy of which is appended as Exhibit A. The markets were:

- Chartis (formerly AIG).
- ACE.
- Certain Interested Underwriters at Lloyd's, London.
- Federal Insurance (Chubb Group).

20. In the side by side comparison of insuring terms the category, "Policy Conditions that Apply During Yard Periods,"

- For Chartis/AIG and ACE, reads, in part: While the policy contains no specific reference to yard periods . . .
- For Chubb the comparison makes mention that a Refit Deductible at two (2) times the standard Hull deductible would apply.

21. The Marsh side by side comparison for Chartis/AIG and ACE goes on to read, in part:

- The Contractual Liability Exclusion clause could apply depending on the stipulations of the yard contract.

22. The foregoing comparison by Marsh in effect attempts to equate the Contractual Liability Exclusion in the Chartis, Ace (and Chubb) policies to be on par with Lloyd's onerous Maintenance and Repair Clause, which is inaccurate.

23. Marsh was requested to provide copies of yacht policy insurance forms available in the market place for the years 2010 through 2013. In connection with that request Marsh provided two editions each of AIG/Chartis, ACE and Chubb. True and correct copies of these specimen policies are appended as Exhibit B. They did not provide any yacht policy forms for any other insurance company offering yacht insurance coverage.

24. As respects specimens of AIG/Chartis, ACE and Chubb's yacht policy forms, none of them included the Maintenance and Repair Clause found in the Lloyd's yacht policy Cover Notes arranged by Marsh through Ropner for Bear. Likewise, the AIG policy obtained by Marsh for Larry Jodsaas on the M/Y

"*APHRODITE*" in 2009, a true and correct copy of which is appended as Exhibit C, did not contain a Maintenance and Repair Clause.

25. Based on my search efforts for yacht policy forms including but not limited to going to the websites for AIMU and Witherby Insurance and per the deposition testimony of Nicholas Smith, it is clear the "Maintenance and Repair Clause" is not commonly used in yacht policies.

26. I am generally familiar with the standard forms of hull policies as used by insurers, including American Yacht Form R12, American Institute Hull Clauses, and London Institute Hull Clauses. The American Yacht Form contains no provision regarding yard periods. The American Institute Hull Clauses and London Institute Hull Clauses cover loss resulting from the negligence of ship repairers.

27. The London market's standard yacht form is London Institute Yacht Clauses Cl328 (1/11/85) which provides named perils coverage and has no Maintenance and Repair Clause.

28. Pantaenius is a broker whose home office appears to be in Hamburg, Germany. They have offices in a number of European countries as well as the U.S. (New York City). Their Super Yacht policy provides "All Risks" coverage. They also offer a named perils policy. Neither Pantaenius Yacht Forms include a Maintenance and Repair Clause.

29. Like Chubb, the named peril Pantaenius policy restricts coverage if the Assured "elects" to do a refit. A refit represents an added risk an underwriter would not normally contemplate nor include in his pricing. A yacht underwriter limiting (doubling the Hull deductible) or exclude coverage when a yacht owner decides/elects to do a refit is similar to medical insurer excluding coverage for elective surgery like a face lift On the other hand, for any underwriter to suggest that their Hull pricing does not contemplate and include the possibility of covered loss or damage to the insured vessel is absurd. Hull damage repairs from a

covered event often being both "major" and involving "hot work" should be, and traditionally have been, part of an underwriter's pricing. An underwriter should neither expect nor be allowed the right to re-underwrite the hull risk after a covered loss has occurred, as is possible under the Maintenance and Repair Clause in this case.

### Failure to Recommend Chubb Policy

30. When the Chubb policy is compared with Lloyd's, in terms of its coverage, the Chubb policy is far and away superior to Lloyd's, and the others proposed by Marsh to Bear on or about November 1, 2010.

31. Marsh breached its duty to Bear, and its own professional standards, by not providing sufficient information in the November 1, 2010, Yacht Insurance Proposal, to permit Bear to make a fully informed decision, and by not recommending the Chubb policy to Bear.

32. Had Bear chosen the Chubb policy, the Chubb policy would have covered the loss at issue in this case.

33. In comparing the Hull coverage offered by Chubb (with reference to ACE and Chartis as well) to the Hull coverage offered/bound by Lloyd's, I make the following points.

34. The Lloyd's Yacht policy (Cover Note) is subject to: the American Yacht Form R12 wording which provides All Risks Hull coverage subject to eight (8) standard Exclusions. It is the standard custom and practice to delete Exclusions 2, 3, 4, 5 and 7. Any Assured would have the expectation that the coverage they are purchasing is the broadest available.

35. The Lloyd's Yacht policy drastically reduces the All Risks Hull coverage with the following Maintenance and Repair Clause:

> Maintenance and Repair Clause
> It is hereby understood and agreed that this insurance will remain in full force whilst your yacht is undergoing annual maintenance, repair of any part or replacement of any part like for like.

Notwithstanding the foregoing it is a condition precedent that if the vessel is currently undergoing major refit or repairs, alterations, remodeling or where hot work is being undertaken (other than soldering) or that the yard has requested a waiver of subrogation from the Owner or his Legal Representative(s) then prior agreement must be obtained from participating insurers hereunder.

Furthermore the Owner or his Legal Representative(s) must provide a copy of the current shipyards Ship Repairers Legal Liability insurance documentation and a full update or schedule of works being carried out during the period of this insurance and obtain Underwriters specific agreement (in writing).

Underwriters participating hereon reserve their rights to amend the terms and conditions of this insurance and to charge an appropriate additional premium.

36. In the Marsh Yacht Insurance Proposal (Exhibit A), the section entitled "Policy Conditions that Apply During Yard Periods" reads, in part:

- Lloyd's - has a Maintenance and Repair Clause.
- ACE and Chartis - contains no specific reference to yard periods, the Contractual Liability Exclusion clause **could apply** (emphasis added) depending on the stipulations of the yard contract.
- Chubb - there is mention of the Special Refit Deductible and the Contractual Liability Exclusion clause **could apply** (emphasis added).

37. Marsh's proposal also suggests a policy (Chubb, ACE, and Chartis), with no specific reference to yard periods, and which contains waiver of subrogation and/or contractual liability exclusion clause(s), is (or could be) comparable to and/or on par with Lloyd's Maintenance and Repair Clause, which is inaccurate.

38. Marsh knew or should have known that the Lloyd's Maintenance and Repair Clause was clearly far more onerous and restrictive than the provisions in the Chubb, ACE, and Chartis policies and highlighted that fact in their proposal to Bear.

39. Chubb (ACE and Chartis), by the mere fact their policy(ies) did not include the Maintenance and Repair Clause, all of these U.S. insurance companies

were offering quotes which provided broader Hull coverage than Lloyd's.

40. Accepting standard yard contracts - the Chubb policy allows the assured to accept the yard's standard contract, including any waiver of subrogation, in connection with a covered Hull claim. It also noteworthy that there is NO mention of Hot Work in the Chubb (ACE and Chartis) policy(ies). Chubb also had a provision that when waiver of subrogation is required through a written contract by a yacht club, marina or similar facility used for the purpose of storage or slip rental, Chubb permits the insured to waive their rights to subrogation.

41. Crew requirements – Lloyd's required 3 crew, Chartis 4 (3 full-time and 1 occasional) crew, while Chubb and ACE required 2 crew. Chubb (and ACE) had coverage broader than Lloyd's.

42. Use Warranty - Lloyd's and Chartis limited coverage to private pleasure use only. Chubb (and ACE) allow private pleasure charter when the yacht is in the care and control of the Captain on file. Again, Chubb (and ACE) had broader coverage than Lloyd's.

43. Excess Liability Coverage/Limits - In addition to physical loss or damage to the yacht/vessel, the Hull policy provides these additional coverages:

- Collision liability,
- Sue & Labor, and
- General Average.

The Chubb (ACE and Chartis) quote(s) was (were) based on providing $17,000,000 ($17,250,000 including the $250,000 for personal effects) for each of four (4) coverages:

- Hull,
- Collision Liability,
- Sue & Labor, and
- General Average.

44. On the other hand, the Lloyd's Cover Note (p. 3 of 58) provides for the increased value of Hull and Machinery, etc., P.P.I. F.I.A. (Policy Proof of Interest Full Interest Admitted) **excluding Excess Liabilities**. (emphasis added) Thus, Lloyd's placement provided:

- $17,000,000 of Hull coverage ($17,250,000) including Personal Effects) but only,
- $12,000,000 ($12,150,000) for each of the other three (3) coverages, Collision Liability, Sue & Labor, and General Average.

Again, Chubb (ACE and Chartis) had broader coverage than Lloyd's.

45. Marsh failed to disclose in their November 1, 2010 Proposal that the Lloyd's Proposal was not a single layer, agreed-value policy. As a result, Bear was not advised of the reduced limit applying to Collision Liability, Sue & Labor, and General Average.

46. Deductible - Chubb had a higher deductible then Lloyd's ($170,000 ($340,000 for refit) versus $121,500).

47. As respects a refit exposure, the policy/underwriting response by Chubb is to address the increased exposure associated with a refit by naming/requiring 2 times their standard Hull deductible for loss in connection with a refit. On the other hand, Lloyd's eviscerates the policy All Risks provisions by introducing the "Maintenance and Repair Clause" placing numerous and onerous requirements on the Assured, and allowing Underwriters to deny coverage or revise the provisions of the policy and/or charge a higher premium. Thus, with respect to refit, Chubb provided broader coverage than Lloyd's.

48. In the November 1, 2010 Proposal provided by Marsh to Bear, for Hull limits and P&I limits the combined premiums were as follows:

a. Option I Hull ($17MM) and P&I ($20 MM)
- Chubb $107,512.00.

12

- Lloyd's $93,092.59 (including Excess P&I).

b. Option II Hull

- Chubb Hull Only $90,289.00 (and British Marine) - $104,489.00.
- Lloyd's Hull Only $73,740.75 (and British Marine) - $87,940.75.

49. An Option II for Chubb (and any other market providing a Hull Only quote) should have been included in the Marsh presentation. For Chubb, the Option II would have had: A minor premium reduction ($104,489 vs. $107,512) and a significant increase in the P&I limit ($20,000,000 vs. $500,000,00).

50. Although premium is an important consideration when purchasing insurance, it is not a coverage issue.

51. Crew Warranty - a side-by-side comparison of crew requirements between the Lloyd's and Marsh proposals reveals the following:

   a. Lloyd's Hull – Review and approval of Captain and 1st Mate and minimum of 3 experienced persons when navigating.
   b. Chubb review and approval of Captain and 1st Mate, with Underwriters requiring additional crew for longer voyages and Panama Canal transits.

Thus, the minimum crew requirement for Lloyd's is 3 and Chubb 2. If at the time of a Hull loss, the crew consists of only the approved Captain and one mate, the Chubb policy provides coverage and pays the claim. The Lloyd's policy excludes the claim citing failure to meet the 3-crew minimum requirement. Again, on this subject, Chubb provides broader coverage than Lloyd's.

52. In summary, of particular relevancy to this case,

   a. The Chubb policy imposed NO Hot Work exclusions, limitations or requirements on the Assured.
   b. The Chubb waiver of subrogation clause has an expressed

exception which allows the Assured to sign a written contract for repair of the Yacht as a result of a covered loss.

c. There is no question Hull damage sustained by the M/Y "*POLAR BEAR*" as a result of hitting the San Diego Harbor jetty was a covered loss.

Based on the foregoing, the Chubb policy would have provided coverage while the M/Y "*POLAR BEAR*" was undergoing repairs at the Marine Group Boat Works ("Marine Group") boatyard in May and June 2014.

### Effect of Chubb Policy

53. If Marsh had fully disclosed the significant coverage differences/enhancements and/or recommended to Bear that it purchase the Chubb policy in 2010, and Bear had done so in reliance on that full disclosure/advice, it is highly probable – certainly more probable than not – that in 2013, the same policy would have been in place and provided coverage for the fire loss at the Marine Group boatyard. One of the reasons that Bear was at the Marine Group boatyard in 2014 was to repair the damage done from running aground on the jetty at the entry to San Diego harbor. This was clearly a covered loss. Thus, even if Bear did waive subrogation, the Chubb policy would cover Bear for loss during repairs.

54. It is highly probable – certainly more probable than not – that coming off a loss free year, short of Chubb deciding to exit the Mega Yacht market, naming a significant rate and/or deductible increase, and/or restricting coverage, Bear would have continued to renew their policy with through the 2013-2014 policy year. After purchasing the first policy in 2011, it is unlikely that Bear would purchase a different policy in the two following years. It is the standard custom and practice in the industry not to go to market every year for yacht insurance coverage. As occurred here, Marsh followed the standard custom and practice by not recommending to Bear that it go to market for competitive quotes

14
Case No. 3:15-cv-00630-BTM (BLM)

for either the 2012-2013 or the 2013-2014 policy years.

55.   Chubb remained in the yacht insurance market through 2014, and continues in that market to the present. Under the standard custom and practice in the industry, it would be highly probable – certainly more probable than not – that the renewal premiums offered by Chubb for the 2012-2013 and 2013-2014 policy years, would not have been materially different from their premium offering for the 2011-2012 policy year.

56.   Bear provided notice to Marsh on June 17, 2014, of loss to the M/Y "*POLAR BEAR*". Under Chubb's yacht policy notice to the agent (Marsh) is notice to Chubb. Accordingly, Bear was covered during the repair period for any losses that occurred in the boatyard, including loss by fire. Again, the Chubb policy had no requirement that subrogation rights not be waived, had no requirement that Chubb approve major repairs, and had no requirement that hot work be approved by Chubb when repairs were being made for a covered loss.

## August 2013 Policy Application

57.   In August 2013, Roger Trafton submitted to Johnson at Marsh an application for the 2013/2014 policy year. As acknowledged/admitted in Marsh's memorandum for summary judgment (page 22, ftn. 4), the application indicates that Bear intends to have one yard visit during the policy period. Under the standard customs and practices of the industry, and particularly given what Johnson knew about the notice requirements under the Maintenance and Repair Clause, she had a duty to follow up with Bear/Trafton when she received the application to determine, to the extent known, the full particulars of the expected yard visit. And, if full particulars were not available, to follow-up during the policy year to determine when the yard visit would occur, what repairs would be done, and where. Johnson could then be sure that the requirements of the Maintenance and Repair Clause regarding subrogation and hot work were satisfied and that the underwriters in this case agreed to coverage during repairs.

Alternatively, if the underwriters did not agree, she should have recommended that Bear obtain a First Party Ship Repairers Liability policy to cover any losses that might occur during repairs. A true and correct copy of the First Party Ship Repairers Liability policy launched by Ropner in 2010 is appended as Exhibit D. If those steps had been taken by Marsh, it is highly probable – certainly more probable than not – that coverage would have been secured from the underwriters under the existing Lloyd's policy and/or the First Party Ship Repairers Liability policy.

58. The Marine Group was an approved yard under the Ropner First Party Ship Repairers Liability policy.

59. The opinions set forth in this declaration are based upon the standard customs and practices of the industry as I have come to know them through my more than 35 years of experience, and the documents and testimony I have reviewed. I understand that Florida law applies to the substantive issues in Bear's Second Amended Third-Party Complaint against Marsh. However, the standard customs and practices of the industry that I have set forth in this declaration are not peculiar to Florida, but apply nationwide. The acts and omissions of Marsh criticized in this declaration fall below the standard of care that a reasonably careful broker would use in like circumstances.

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct, and that this declaration was executed on September 9, 2016, at Ovilla, Texas.

_/s/ Michael T. Fitzgerald_
Michael T. Fitzgerald