UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| CERTAIN INTERESTED UNDERWRITERS AT LLOYD'S, LONDON, | Case No.: 15-cv-630-BTM-BLM |
|---|---|
| Plaintiff, | **ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [ECF NO. 70] AND DENYING MOTION TO STRIKE [ECF No. 111]** |
| v. | |
| BEAR, LLC, et al., | |
| Defendant. | |
| AND RELATED COUNTER- AND THIRD-PARTY ACTIONS | |

Plaintiff Certain Interested Underwriters at Lloyd's, London ("Underwriters") has filed a motion for summary judgment. (Underwriters' Mot. Summ. J. ("Underwriters' MSJ"), ECF No. 70.) For the reasons set forth below, the motion is granted.

## I. FACTUAL BACKGROUND

This action arises out of a marine insurance coverage dispute relating to the destruction of a 102-foot motor vessel ("the *Polar Bear*") owned by Defendant, Bear, LLC ("Bear").

1

## A. Procuring the 2013 Policy

In 2010 and 2011, Larry Jodsaas ("Jodsaas"), the owner and managing member of Bear, and Roger Trafton ("Trafton"), the *Polar Bear's* captain, sought Marsh USA's ("Marsh") agent, Kathy Johnson's ("Johnson") assistance in securing an insurance policy for the *Polar Bear*. (Underwriters Ex. A–5, ECF No. 70–3, ¶ 24.) Marsh submitted requests for insurance quotes for the *Polar Bear* to several insurers, including Underwriters through Marsh's London broker, Ropner Insurance Services ("Ropner"). (Underwriters Ex. A-6, ¶ 26.) Bear chose to purchase the policy quoted by Underwriters. (Underwriters Ex. E–293, ECF No. 70–3.) The policy was renewed twice more in 2012 and 2013. (Underwriters Ex. F–294, ECF NO. 70–3; Ex. G–295, ECF No. 70–3.)

The 2013 policy ("the Policy") contained the following relevant provisions:

**CONDITIONS PRECEDENT**

### Maintenance and Repair Clause

It is hereby understood and agreed that this insurance will remain in full force whilst your yacht is undergoing annual maintenance, repair of any part or replacement of any part like for like.

**Notwithstanding the foregoing it is a conditions precedent that if the vessel is currently undergoing or may undergo major refit or repairs, alterations, remodeling or where hot work is being undertaken (other than soldering) or that the yard has requested a waiver of subrogation from the Owner or his Legal Representative(s), then prior agreement must be obtained from participating insurers hereunder.**

Furthermore the Owner or his Legal Representative(s) must provide a copy of the current shipyards Ship Repairers Legal Liability insurance documentation and a full update or schedule of works being carried out during the period of this insurance and obtain Underwriters specific agreement (in writing).

Underwriters participating hereon reserve their rights to amend the terms and conditions of this insurance and to charge an appropriate

2

additional premium.

**NOTICE OF LOSS AND FILING OF PROOF**

It is agreed by the Assured to report immediately to the Assurers or to their representatives who shall have issued this Policy every occurrence which may become a claim under this Policy, and shall also file with the Assurers or their representative, a detailed sworn proof of loss and proof of interest and/or receipted bills in case of a partial loss, within ninety (90) days from date of loss.

**LEGAL REPRESENTATION AND CO-OPERATION CLAUSE**

The Assured shall co-operate with the Assurers and shall not assume any obligation, admit any liability or incur any expense for which the Assurers may be liable, without the written approval of the Assurers, except as may be necessary and permitted to safeguard the Yacht under the "SUE AND LABOR" clause in section "A" of this policy.

**SUE AND LABOR CLAUSE**

And in case of any loss of misfortune, it shall be lawful and necessary for the Assured, their factors, servants and assigns, to sue, labor and travel for, in and about the defense, safeguard and recovery of the said yacht or any part thereof, without prejudice to this insurance; the charges whereof we, the Assurers, will pay. And it is especially declared and agreed that no acts of the Assurer or Assured in recovery, saving or preserving the property insured shall be considered a waiver or acceptance of abandonment.

(Underwriters Ex. K-427, K-433, K-434, K-439, ECF NO. 70–3.)

On August 22, 2013, Trafton, who acted as Jodsaas' agent, signed an "Acknowledgment Form," taking notice of "important policy terms and conditions" in the Policy. (Underwriters Ex. Y-569, ECF No. 70–4.) On August 28, 2013, Marsh sent Bear a "Cover Note" from Ropner, evidencing insurance coverage under the Policy. (Underwriters Ex. K-415.) On October 9, 2013, Marsh sent Jodsaas a letter which enclosed the Policy for the *Polar Bear* providing coverage from August 26, 2013 to August 25, 2014. (Underwriters Ex. G.)

### B. Destruction of the *Polar Bear*

On May 4 or 5, 2014, the *Polar Bear*'s forward stabilizer and its actuator failed during a voyage from Cabo San Lucas, Mexico to San Diego, California. (Underwriters Ex. A-15, ¶ 67.) On May 6, 2014, the *Polar Bear* ran aground at the entrance of the San Diego Harbor damaging the bottom of the hull, port and starboard sides of the keel, and the aft port stabilizer shaft. (Id. at ¶ 68.) Because of the damage, water began to come in through the damaged area around the stabilizer shaft. (Id.) The *Polar Bear* traveled on its own to the Marine Group Boat Works, LLC ("MGBW") boatyard in Chula Vista where it was to be repaired on May 7, 2014. (Id. at ¶ 69.) As a safety measure, the *Polar Bear* was accompanied by a diver and two small towboats. (Id.) MGBW was the only repair facility for pleasure yachts in San Diego capable of lifting the *Polar Bear*. (Underwriters Ex. A-16, ¶ 70.)

On May 7, 2014, just before the *Polar Bear* was hauled out, Trafton signed a written contract with MGBW. (Id. at ¶ 71.) The service contract provided that the *Polar Bear* would be hauled out, blocked and launched for a total of $3500. (Underwriters Ex. A-162.) The contract was double-sided but Trafton only signed the front-side. (Underwriters Ex. A-163.) The back-side contained several provisions, including an "owner assumption of risk" clause, an "owner's exclusive remedy" clause, and an "indemnity, insurance and waiver of subrogation" clause. (Id.) Bear did not notify nor acquire Underwriters' consent prior to signing the contract.

From May 22, 2014 through early June, 2014, Trafton executed numerous work change orders for repairs to the *Polar Bear*, including the May 22, 2014 order for hot work repairs to the hull. (Underwriters Ex. A 165–71.) Bear did not notify nor acquire Underwriters' consent prior to executing the work change orders. (Underwriters Ex. B2-251, ECF No. 70–4, 639:6–18.) On June 17, 2014, Jodsaas spoke with Patrice M. Grossinger of Marsh and informed her that the *Polar Bear*

4

hit some rocks as it traveled back from Mexico. (Underwriters Ex. KK-653, ECF No. 70–4.) He communicated to her that it resulted in $250,000 in damages, but had not filed a claim with Kathy Johnson. (Id.) Grossinger advised him to file a claim if costs got any higher. (Id.) On June 19, 2014, the *Polar Bear* caught fire while MGBW subcontractors were performing hot work repairs to the steel hull. (Underwriters Ex. A-21.) The fire resulted in the *Polar Bear's* total loss. (Id.)

### C. Communications After the Fire

On June 19, 2014, Bear communicated a notice of loss to Marsh. (Underwriters Ex. N-490, ECF No. 70–4, ¶ 23.) On June 30, 2014, Underwriters acknowledged Bear's notice of loss, subject to a reservation of rights, and requested information and documentation. (Underwriters Ex. A-173.) On August 6, 2014, Underwriters sent Bear a reservation of rights letter. (Underwriters Ex. A-179–88.) On March 20, 2015, Underwriters denied coverage on the ground that Bear had failed to satisfy the conditions precedent set forth under the Maintenance and Repair Clause ("Repair Clause"). (Underwriters Ex. A-202.)

On March 20, 2015, Underwriters filed this action seeking a declaration that coverage does not exist under the Policy for Bear's claim relating to the loss to the *Polar Bear*. (Compl. ECF No. 1.) Bear filed counterclaims against Underwriters for declaratory relief, breach of contract and implied covenant of good faith and fair dealing, as well as a third-party complaint against Marsh. (Bear's Second Countercl. and Second Third-Part Compl., ECF No. 63.)

## II. STANDARD

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure if the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986); *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 323 (1986).

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to establish an essential element of the nonmoving party's case on which the nonmoving party bears the burden of proving at trial. Id. at 322-23. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

Once the moving party establishes the absence of genuine issues of material fact, the burden shifts to the nonmoving party to demonstrate that a genuine issue of disputed fact remains. *Celotex*, 477 U.S. at 314. The nonmoving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of his pleadings." Anderson, 477 U.S. at 256. Rather, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (quoting Fed.R.Civ.P. 56(e)).

The court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

## II. DISCUSSION

### A. Applicable Law

Underwriters' declaratory relief claim against Bear falls within this Court's admiralty jurisdiction because it pertains to a disputed marine insurance policy. *See* 28 U.S.C. § 1333; *Norfolk S. Ry. Co. v. James N. Kirby*, 543 U.S. 14, 26 (2004). Disputes arising under marine insurance policies are governed by "federal admiralty law when an established federal rule addresses the issues raised." *Kiernan v. Zurich Companies*, 150 F.3d 1120, 1121 (9th Cir. 1998). Where there is no established federal rule, federal courts look to state law to interpret maritime insurance policies. *Yu v. Albany*, 281 F.3d 803, 806 (9th Cir. 2002).

In the absence of a contractual choice-of-law provision, federal courts sitting in admiralty apply federal maritime choice-of-law principles to determine which state's law applies. *Chan v. Society of Expeditions, Inc.*, 123 F.3d 1287, 1296 (9th Cir. 1997). However, where the parties have contractually agreed on which law will apply, admiralty courts will generally give effect to that choice unless:

> 'the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice' or 'application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue' and that state would be the state of applicable law in the absence of a choice-of-law clause.

Id. at 1297 (quoting *Restatement (Second) of Conflict of Law* § 187(2) 1988).

Here, the Policy contains a choice-of-law provision that states: "[t]his insurance shall be governed by and construed in accordance with the laws of the State of Delaware each Party agrees to submit to the exclusive jurisdiction of the Courts of the United States of America." (Underwriters Ex. K-428.) Both parties agree that in absence of an established federal rule, Delaware law applies to the issues arising under the insurance policy. Additionally, Bear is both incorporated and has its principal place of business in Delaware. Therefore, the Court will honor

the parties' contractual agreement. Because there is no specific federal rule governing construction of maritime insurance contracts, the Court will apply Delaware law where necessary. See *Wilburn Boat Co. v. Fireman's Fund Insurance Co.*, 348 U.S. 310, 316 (1955).

**B. Construction of the Marine Insurance Contract**

According to Underwriters, the Policy does not provide coverage because Bear failed to satisfy certain conditions precedent under the Policy. Underwriters argue that the Repair Clause constitutes an unambiguous "warranty" that must be strictly complied with. Namely, Bear failed to satisfy conditions precedent requiring Bear to notify and obtain Underwriters' prior agreement if: (1) the *Polar Bear* is undergoing major refit or repairs, alterations or remodeling; (2) hot work is being undertaken; or (3) the shipyard has requested a waiver of subrogation from the owner or legal representatives. Bear also failed to provide Underwriters with certain documents from MGBW. Bear contends that the Repair Clause is not a warranty, but instead an ambiguous exclusion from liability.

### 1. The Repair Clause is a Warranty

The Court agrees with Underwriters that the Repair Clause is a warranty by Bear, rather than an exclusion from coverage.

While a marine insurance policy may appear to extend coverage to a particular loss, policy exclusions and warranties often limit coverage so that the loss at issue is not covered. An exclusion, usually found in an all-risk policy, explicitly "clarif[ies] and define[s] the types of events an insurer does not intend to cover." David D. Hallock, Jrs., *Recent Developments in Marine Hull Insurance: Charting a Course Through the Coastal States of the Fourth, Fifth, Ninth, and Eleventh Circuits*, 10 U.S.F. Mar. L.J. 277, 301 (1988). For an insurer to justifiably deny coverage under an exclusion, the insurer must demonstrate that all proximate causes of the loss are excluded. *Id.*

By contrast, a "warranty is a promise 'by which the assured undertakes that

8

15-cv-630-BTM-BLM

some particular thing shall or shall not be done, or that some condition shall be fulfilled, or whereby he affirms or negatives the existence of a particular state of facts.'" *Commercial Union Ins. Co. v. Flagship Marine Servs. Inc.*, 190 F.3d 26, 31 2d Cir. 1999) (quoting Leslie J. Buglass, *Marine Insurance & General Average in the United States* 27 (2d ed. 1981) (quoting Sect. 33(1) of the English Marine Insurance Act, 1906)); Thomas J. Schoenbaum, *Warranties in the Law of Marine Insurance: Some Suggestions for Reform of English and American Law*, 23 Tul. Mar. L.J. 267, 268–69 (1999) ("Shoenbaum, *Warranties*"). The strict compliance rule for marine insurance warranties holds that warranties must be strictly performed; no motive or necessity will excuse a breach. Id. at 281–82.

The effect of a breach of warranty in a marine insurance policy is governed by state law. *Wilburn Boat Co.*, 348 U.S. at 317; *Suydam v. Reed Stenhouse of Washington, Inc.*, 820 F.2d 1506, 1508 (9th Cir.1987) (referring to state law to resolve a breach of express warranty in a marine insurance policy); *Commercial Union Ins. Co.*, 190 F.3d at 31 (relying on state law to determine whether an insurance contract provision constituted a warranty); *Yu*, 281 F.3d at 807 n.3 (applying Hawaii law because "there is no general federal rule governing how the language in marine insurance contracts is to be construed."). Under Delaware law, a warranty or a condition precedent is a part of the contract when completed. *Baltimore Life Ins. Co. v. Floyd*, 94 A. 515, 517 (Del. 1915). A warranty "whether material or not must be strictly complied with . . . ." Id. "To make such a statement a condition precedent to the performance of the agreement it must clearly appear that it was so intended." *Id.* In Delaware, courts do not favor warranties by construction. *Id.* at 518. Therefore, warranties only exists upon the fair interpretation and clear intention of the words of the parties. *Id.*

Here, it is clear from the Repair Clause's language and context within the Policy that the parties intended for the provision to serve as a warranty. First, unlike an exclusion, the language in this provision is not a negative statement

disclaiming coverage. Instead, the Repair Clause conditions coverage on Bear notifying Underwriters and obtaining their prior agreement. Stated differently, the language provides that while Bear understands that annual maintenance and repairs or replacements of any part like for like are fully covered, if that work amounts to major repairs, hot work or the shipyard is requesting a waiver of subrogation, then Bear "undertakes that some . . . condition[s] shall be fulfilled." *Commercial Union Ins. Co.*, 190 F.3d at 31.

Second, the Repair Clause appears on page 13 of the Policy under the "**CONDITIONS PRECEDENT**" header, following the "**EXPRESS WARRANTIES**" header. Though the provision does not itself begin with the word "warranted," it follows three subsections within the same header that do begin with this word. The relevant provision also begins with this signal: "[n]otwithstanding the foregoing it is a conditions precedent that . . . ." (Underwriters Ex. K-427.) Moreover, unlike the "exclusions" paragraph that appears on page 25, the "express warranties" and "conditions precedent" headers appear on page 13 of the Policy.

Bear argues that the Repair Clause reveals no intent to create a warranty because it provides that Bear's noncompliance "may result in . . . denial of coverage." (Bear's Opp'n to Underwriters MSJ ("Bear's Opp'n"), ECF No. 83 12–13.) It argues that "[b]ecause noncompliance does not necessarily void the Policy and coverage depends on Underwriters' consent to a new agreement, the Repair Clause is not a warranty by Bear." (*Id.*) However, unlike the English rule of automatic discharge where the effect of a breach of warranty is that the liability of the insurer ceases on the date of that breach, the American law rule on the effect of a breach is that coverage is voidable. Shoenbaum, *Warranties*, 23 Tul. Mar. L.J. at 294. That is to say, under American law, "non-fulfillment of the condition does not prevent the contract from coming into existence, but merely affects the duty of the insurer to pay the loss." *Id.* Therefore, the use of the words "may result" accurately defines the effect of a breach of warranty under American law.

Consequently, in light of the provision's language and textual cues, the Court finds that the parties intended for this provision to constitute a warranty, not an exclusion.

Bear also argues, in the alternative, that the Repair Clause is a forfeiture provision. Under Delaware law, it is settled that before coverage is forfeited due to a failure to notify, the insurer must establish prejudice. *Hercules, Inc. v. AIG Aviation, Inc.*, 776 A.2d 550, 567 (Del. 2000). Bear's argument fails for two reasons. First, the Repair Clause does not require that Bear merely notify Underwriters of major repairs, hot work, and/or waivers of subrogation. Instead, it conditions coverage on notice, Underwriter's agreement to the proposed work and receipt of relevant documentation. Second, breach of the Repair Clause does not conceptually result in a forfeiture. The case upon which Bear relies involves a "loss or forfeiture with respect to a risk which was undeniably within the policy's coverage." *State Farm Mut. Auto. Ins. Co. v. Johnson*, 320 A.2d 345, 347 (Del. 1988) (finding that a failure of insured to notify insurer "as soon as practicable," as required by policy, will not relieve insurer of its liability unless it shows it was prejudiced by the delay). With forfeiture provisions, "[a]lthough the policy may speak of the notice provision in terms of condition precedent, nonetheless what is involved is a forfeiture, for the carrier seeks, on account of a breach of that provision, to deny the insured the very thing paid for." *Id.* at 347 (internal citations omitted). As the court in *State Farm Mut. Auto Ins. Co. v. Johnson* notes, cases implicating forfeitures are therefore different from those that deal with "the existence or non-existence of coverage for a certain type of loss." *Id.* at 347. Here, the central issue that the Repair Clause creates is whether the Policy provides coverage for this type of loss. Thus, the cases that Bear relies on are inapposite.

**2. The Repair Clause is Unambiguous**

Because coverage here depends on whether Bear breached the warranty, the Court now turns to the interpretation of the Repair Clause.

11

15-cv-630-BTM-BLM

Under Delaware law, the proper construction of an insurance contract is purely a question of law. *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992). It is well established that ambiguous language in an insurance policy is construed against the insurance company, because the insurer drafted the language that is interpreted. *Hallowell v. State Farm Mut. Auto. Ins. Co.*, 443 A.2d 925, 926 (Del. 1982). However, "if the language is clear and unambiguous a Delaware court will not destroy or twist the words under the guise of construing them." Id. If the language of an insurance contract is in fact clear and unequivocal, a party will be bound by its plain meaning, because "an insured has a duty to read his insurance policy." Id. at 928. A contract is not rendered ambiguous simply because the parties do not agree as to its interpretation. *Rhone-Poulenc Basic Chems. Co.*, 616 A.2d at 1196. Instead, ambiguity exists only when the provision in controversy permits two or more reasonable interpretations. Id.

The Repair Clause begins by recognizing that the insurance will remain in full force while the yacht is undergoing "*annual* maintenance, repair of any part or replacement of any part like for like." (Underwriters Ex. K-427 (emphasis added).) Notwithstanding this affirmation, it conditions coverage on Bear notifying and obtaining Underwriters' prior agreement where the vessel is (1) "currently undergoing or may undergo major refit or repairs, alterations, remodeling;" or (2) "where hot work is being undertaken (other than soldering);" or (3) where "the yard has requested a waiver of subrogation from the Owner . . . ." (Id.) It also obligates Bear to provide Underwriters with a copy of the shipyard's insurance documents and a full update or schedule of work being carried out. (Id.) Finally, it requires Bear to obtain Underwriters' specific written agreement to this work. (Id.) The Court finds that the provision is clear on its face—it provides coverage for annual maintenance and repairs, but where those repairs are "major," or require hot work, or the shipyard performing those repairs requires a waiver of subrogation, Bear

must satisfy certain conditions before Underwriters extend coverage.

Bear argues that this provision is ambiguous because it obligates Bear to obtain Underwriters' consent to cover the Vessel during repairs, while the Cooperation Clause expressly relieves Bear of such obligation for sue and labor activities. Underwriters in turn argue that the Repair Clause and Sue and Labor Clause are separate clauses that can be easily harmonized. The Court agrees with Underwriters.

A "sue and labor" clause is considered to be a separate insurance that supplements a marine insurance contract. Russell M. Pfeifer, *Navigating Through the Shoals of the Marine Hull Policy: A Chart for Insurers*, 17 U.S.F. Mar. L.J. 89, 119 (discussing the effect of "sue and labor" and "cooperation" clauses). Its purpose "is to encourage and bind the assured to take steps to prevent a loss for which the underwriters would be liable, and when such loss does occur, to take affirmative steps to mitigate loss." *Id.*; *see also*, *Reliance Ins. Co. v. The Escapade*, 280 F.2d 482, 488 n.11 (5th Cir. 1960). Here, it does just that. It requires Bear to take steps to defend, safeguard, and recover the *Polar Bear* in the event of a loss or misfortune. Read in connection with the Cooperation Clause, Bear was not required to obtain written approval from Underwriters for expenses associated with saving and preserving the *Polar Bear* like towing and hauling it out. However, under the Repair Clause, once the *Polar Bear* was no longer in danger of further loss, coverage for any repairs that qualified as "major," or that required hot work or a waiver of subrogation, was conditioned on notice and prior agreement. Thus, a reasonable interpretation of the clauses reveals no contradiction.

Bear also argues that the Repair Clause puts Bear in an untenable position because it is in conflict with its duties under the implied warranty of seaworthiness. However, the Court agrees with Underwriters that the conditions precedent set out in the Repair Clause merely allow Underwriters to assess the new risk, rather than

13

15-cv-630-BTM-BLM

prevent owners from satisfying the implied warranty of seaworthiness. Furthermore, because the Court finds that the Repair Clause is an unambiguous provision, the reasonable expectation doctrine does not apply. *See Hallowell*, 443 A.2d at 928 ("the doctrine of reasonable expectations is applicable in Delaware to a policy of insurance only if the terms thereof are ambiguous or conflicting, or if the policy contains a hidden trap or pitfall, or if the fine print purports to take away what is written in large print.").

### 3. Bear Breached the Repair Clause

Having determined that the Repair Clause is an unambiguous warranty, Bear is entitled to coverage only if it strictly complied with its terms.

The parties dispute whether Jodsaas' conversation with Grossinger on June 17, 2014 constitutes adequate notice under the Repair Clause. The Court need not decide whether Marsh in fact acted as an agent for Underwriters because as already discussed above, the Repair Clause did not require mere notice. It also unambiguously conditioned coverage on Underwriters' prior approval of the work and receipt of relevant documents. Underwriters submit that Bear failed to satisfy *all* the conditions precedent set forth under the Repair Clause. Even assuming that Bear's conversation with Grossinger constituted adequate notice, there is no evidence that Bear satisfied the remaining conditions precedent. Thus, the Court holds that Bear failed to strictly comply with the Repair Clause.

Additionally, while the Court understands that the issue of breach is determined by Delaware law, the Second Circuit's decision in *Commercial Union Ins. V. Flagship Marine Servs.*, 190 F.3d 26, is worth noting. The marine policy at issue there contained a "Tow Endorsement" provision that stated the following:

> In consideration of the rate and premium charged, it is understood and agreed that coverage is hereby provided for the towage of yachts up to 50 feet in length. The towage of yachts in excess of 50 feet is subject to prior approval of underwriters with additional premium to be agreed, if any.

14

15-cv-630-BTM-BLM

*Id.* at 29. The insurer disclaimed coverage because at the time of the accident, the insurer's captain was towing a non-yacht vessel that was in excess of 50 feet in length. *Id.* After reviewing the language of the policy and reading it in the context of the entire contract, the Second Circuit held that the provision was an unambiguous warranty that the insured breached. *Id.* at 31. It stated:

> The Tow Endorsement is clear on its face as to the hazards to which it is addressed. It states that 'in consideration of the rate and premium charged, . . . coverage is hereby provided for the towage of yachts up to 50 feet in length.' This is an affirmative statement of coverage that necessarily implied that the towage of anything other than 'yachts up to 50 feet in length' is not covered. The unambiguous implication of this provision is that, in exchange for [the insurer's] promise to provide coverage at the agreed-upon rate, [the insured] warranted that it would not tow vessels greater than 50 feet. There can be no doubt that this warranty was breached in this case and that it was material, because the length towed was correlated to the risk assumed by [the insured]. Therefore, under New York or Florida law, [the insured's'] breach precludes its recovery under the insurance contract.

*Id.* at 33.

While not binding, the Second Circuit's decision is instructive, because here, the Court is similarly dealing with a provision that affirmatively provides for coverage to some extent, but conditions further coverage on the insurer's agreement. Thus, for the reasons stated above, Underwriters, justifiably denied coverage for damages relating to the *Polar Bear*'s loss.

**C. Underwriters Did Not Admit Coverage**

Bear argues that Underwriters' motion for summary judgment should be denied because they admitted coverage and waived their defenses. Bear relies in particular on Underwriters' Rule 36 responses to Bear's request for admissions. (Bear's Ex. A 7.) The relevant request for admission provided: "Admit that the AUGUST 28, 2013 COVER NOTE was in effect on JUNE 19, 2014." (Bear's Opp'n, Ex. A, ECF No. 101–2, 7.) Underwriters responded: "Admit." (Id.)

Federal Rule of Civil Procedure 36(b) provides that a matter admitted is

15

15-cv-630-BTM-BLM

"conclusively established," unless the court permits the admission to be withdrawn or amended. Fed. R. Civ. P. 36. Because Underwriters did not move to withdraw or amend its response, Bear is correct in arguing that this response conclusively establishes that the Cover Note was in place on the date of the fire. (Bear's Opp'n 9.) However, this admission does not "conclusively establish" that the Policy covered the incident at issue.

For the reasons discussed above, Underwriters justifiably denied Bear coverage.

**D. Remaining Claims**

First, Underwriters move for summary judgment on Bear's counterclaims of breach of contract and implied covenant of good faith and fair dealing. Because the Court concludes that Bear was not entitled to coverage for the *Polar Bear*'s loss, it necessarily follows that Bear is not entitled to damages for Underwriters' alleged breach of contract and tortious conduct in refusing to pay for damages relating to the *Polar Bear*'s total loss. *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005) ("[O]ne generally cannot base a claim for breach of the implied covenant on conduct authorized by the terms of the agreement.").

Second, Underwriters move for summary judgment on Bear's claim that Underwriters are liable for the expenses that Bear incurred under the Sue and Labor Clause. Bear seeks to recover "the cost of the tugs and diver it hired when the Vessel ran aground, the cost of the marine surveyor who evaluated the damages to the Vessel, any amount found by the Court in the Liability Action to be due and owing from Bear to [MGBW] for pre-Fire repair work and layday fees." (Underwriters Ex. A-41, ¶ 140.) While Underwriters do not dispute the Sue and Labor Clause's enforceability, and in part recognize that Bear may have had some recoverable expenses, they argue that its claim is now barred by the Notice of Loss and Filing of Proof Clause ("Notice of Loss Clause"). The Notice

of Loss Clause requires an insured to report immediately every incident that may become a claim and file "a detailed sworn proof of loss and proof of interest and/or receipted bills in case of a partial loss, within ninety (90) days from date of loss." (Underwriters Ex. K-433.)

Bear appears to argue that because sue and labor expenses are not subject to the Policy's deductibles or limitations, they are also not subject to the Policy's proof of loss requirements. Bear has cited no cases to support such proposition and the Court's independent research has not revealed any.

Delaware courts hold that the "purpose of a provision for notice and proof of loss is to afford the insurer an adequate opportunity for investigation, to prevent fraud and imposition upon it, and to enable it to form an intelligent estimate of its rights and liabilities before it is obliged to pay." *Wilmington Amusement Co. v. Pac. Fire Ins. Co.*, 21 A.2d 194, 195 (Del. Super. Ct. 1941). It is well-settled that a provision requiring proof of loss is a condition precedent to coverage that must be complied with, unless waived or excused. *Id.* at 196; *see, e.g., Emory v. Glen Falls Ins. Co.*, 76 A. 230 (Del. Super. Ct. 1908) (instructing jury that to recover, plaintiff must have complied with provisions in the policy, including proof of loss provision, unless it finds evidence of waiver or estoppel); *Standard Accident Ins. Co. v. Ponsell's Drug Stores, Inc.*, 57 A.2d 271, 274 (Del. 1964) (affirming lower court's denial of summary judgment to insurer despite insured's failure to comply with proof of loss provision where there were triable issues of estoppel and waiver). Here, even assuming that Bear's reference to the sue and labor expenses in its First Amended Counterclaim constitutes "notice of loss," it does not satisfy the proof of loss requirement under the Policy. *See Wilmington Amusement Co.*, 21 A.2d at 195 ("notice of loss and formal proofs of loss are matters entirely distinct. Both are required; and a mere notice of loss, verbal or written, cannot supply the place of, or dispense with the more formal proof required by the policy.").

In fact, Bear does not dispute that it did not comply with the proof of loss requirements. Instead, Bear argues that because Underwriters requested evidence of Bear's sue and labor expenses well after the contractual limitation period lapsed, the Court should estop them from asserting, or find they have waived, the defense. The doctrines of waiver and estoppel, though similar, have essential differences. *Nathan Miller, Incorporation v. Northern Insurance Company*, 39 A.2d 23, 25 (Del. Super. Ct. 1944). Estoppel is maintainable only where the conduct of one party has induced another to change his position for the worse. *Id.* A waiver instead depends only on what one party alone intended to do. *Id.* Here, the doctrine of estoppel does not apply because Underwriters' alleged surrender of their right to insist upon strict compliance with the Notice of Loss Clause occurred after the expiration of the stipulated 90 days.

The doctrine of waiver is likewise inapplicable because an intention to waive cannot be implied from Underwriters' request for documentation. *See, id.* at 27. In *Nathan Miller, Inc. v. Northern Insurance Company,* a Delaware court held that an insurance company can become familiar with the extent of a loss and damage without waiving its right to disclaim liability because it is "as consistent with an intention to rely upon the forfeiture provision of the policy with respect to proof of loss as with an intention to forego the right . . . ." *Id.* (rejecting the argument that an insurer waived the proof of loss requirements by visiting the premises and becoming familiar with the extent of the loss and with the cost of the fixtures damaged or destroyed and the cost of replacing or repairing them).

Accordingly, Bear's arguments fail and Underwriters properly denied coverage for the sue and labor expenses.

### E. Objections and Underwriters' Motion to Strike

Both parties raise objections to several declarations and exhibits submitted in support of the opposing parties' papers. Having reviewed the parties' objections and responses, the Court rules as follows:

- Bear's Objections to Underwriters' Ex. E–G, Y, and KK are overruled.

Because the Court did not rely on the remaining declarations and exhibits in reaching its decision, it overrules those objections as moot.

Additionally, on September 30, 2016, pursuant to this Court's chambers rules, Bear filed a sur-reply addressing evidentiary matters arising out of Underwriters' reply brief. (ECF No. 104.) On October 13, 2016, Underwriters filed a motion to strike certain portions of Bear's sur-reply, arguing that its scope goes beyond merely responding to the objections in Underwriters' reply brief. (ECF No. 111.) The rule provides in relevant part:

> Responses to objections contained in a reply brief may be made in a sur-reply brief that does not exceed five pages. The scope of such a sur-reply is limited to responses to objections; any additional argument will be disregarded. Any separately filed objections shall be stricken and will not be considered by the Court.

Hon. Barry Ted Moskowitz Civ. Chambers Rules at 2, Objections, (Feb. 24, 2015), https://www.casd.uscourts.gov/Rules/SitePages/Home.aspx.

Having reviewed Bear's sur-reply brief, the Court finds that pages 3:16–5:8 of Bear's response exceed the permitted scope under the chambers rules. However, there is no prejudice to Underwriters. Accordingly, Underwriters' motion to strike certain portions of Bear's sur-reply brief is **DENIED**.

//
//
//
//
//
//
//
//
//

## IV. CONCLUSION

For the reasons discussed above, Underwriters' motion for summary judgment (ECF No. 70) is **GRANTED** and its motion to strike (ECF No. 111) is **DENIED**. The Clerk shall enter judgment for Underwriters' on their claim for declaratory relief and on Bear's counterclaims for declaratory relief, breach of contract and breach of implied covenant of good faith and fair dealing.

**IT IS SO ORDERED.**

DATED: April 21, 2017

BARRY TED MOSKOWITZ
Chief Judge, United States District Court