UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CERTAIN INTERESTED UNDERWRITERS AT LLOYD'S, LONDON,<br><br>                                   Plaintiff,<br><br>v.<br><br>BEAR, LLC, et al.,<br><br>                                   Defendant.<br>───────────────────────<br>AND RELATED COUNTER- AND THIRD-PARTY ACTIONS | Case No.:  15-cv-630-BTM-BLM<br><br>**ORDER GRANTING IN PART AND DENYING IN PART THIRD-PARTY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [ECF NO. 71] AND DENYING MOTION TO STRIKE [ECF No. 110]** |

Third-Party Defendant Marsh, USA Inc. ("Marsh") has filed a motion for summary judgment. (Marsh's Mot. Summ. J. ("Marsh's MSJ"), ECF No. 71.)  For the reasons set forth below, the motion is granted in part and denied in part.

## I. FACTUAL BACKGROUND

This action arises out of an insurance coverage dispute under a marine insurance policy that Marsh brokered for a 102-foot motor vessel ("the *Polar Bear*") owned by Third-Party Plaintiff, Bear, LLC ("Bear").

## A. Obtaining Coverage for the *Polar Bear*

In 2006, Mr. Larry Jodsaas ("Jodsaas"), the owner and managing member of Bear, with the help of Roger Trafton ("Trafton"), the *Polar Bear*'s captain, entered into a contract with Aleutian Yachts, LLC to build the *Polar Bear*. (Decl. of Roger Trafton, in Supp. of Bear's Opp'n to Marsh's MSJ ("Bear Opp'n"), ECF No. 101–14, ¶ 5.) After construction for the *Polar Bear* was completed in 2011, marine surveyors valued the *Polar Bear* at $17 million. (Marsh's Ex. 23 in Supp. of Marsh's MSJ ("Marsh's Ex."), ECF No. 71–4.) Having contracted for personal and yacht insurance with Marsh before, Jodsaas sought to obtain insurance for the *Polar Bear* through Marsh's Yacht Group. (Trafton Decl. ¶ 9.) The yacht insurance was handled by its broker and Client Advisor, Kathleen Harris Johnson ("Johnson"). (Id.) Marsh submitted requests for insurance quotes for the *Polar Bear* to several insurers, including Plaintiff Underwriters, Chartis, ACE, Chubb, Travelers, and LEAD. (Marsh's Ex. 7, ECF No. 71–3.) On November 2, 2010, Marsh provided Bear with a "Yacht Insurance Proposal" ("2010 Proposal"), which outlined the key terms and provided a comparison of the coverage and exclusions contained in four different policies. (Marsh's Ex. 9, ECF No. 71–3.) On November 8, 2010, Johnson held a conference call with Jodsaas and Trafton and discussed the 2010 Proposal. (Marsh's Ex. 56, Tr. of Kathleen S. Johnson's Dep. 245:11–246:6; 246:21–247:10, ECF No. 71–7.) The 2010 Proposal specifically warned Bear of policy conditions that applied during yard periods, including the "Maintenance and Repair Clause" ("Repair Clause") contained within the Underwriters policy. (Marsh's Ex. 9, 139–140.) In August 2011, Jodsaas authorized Marsh to bind coverage with Underwriters. (Marsh's Ex. 26, 246, ECF No. 71–4.) On August 23, 2011, Jodsaas signed an "Acknowledgment Form" with Marsh, acknowledging, among other things, that he understood that the policy contained warranties. (Id. at 248.)

On October 20, 2011, Johnson forwarded Jodsaas a copy of the 2011–2012 policy along with a cover note which reminded Jodsaas "to keep in mind the

15-cv-630-BTM-BLM

warranties and exclusions of the policy, especially those related to liabilities assumed under contract which are excluded unless approved by underwriters beforehand." (March's Ex. 28, ECF No. 71–4.)

**B. Renewing Coverage for the *Polar Bear* in 2012**

In August 2012, Johnson sent Bear a "Yacht Insurance Renewal Proposal" ("2012 Proposal") which outlined the renewed terms of the Underwriters policy. (Marsh's Ex. 31, ECF No. 71–4.) The 2012 Proposal again warned Bear about the Repair Clause. Bear decided to renew its coverage with Underwriters. (Marsh's Ex. 32, 348, ECF No. 71–5.) On September 27, 2012, Johnson sent Bear a copy of the 2012–2013 policy. (Marsh's Ex. 33, ECF No. 71–5.) That letter also advised Bear to keep in mind the policy's warranties and exclusions. (Id.)

**C. Renewing Coverage for the *Polar Bear* in 2013**

In August 2013, Johnson obtained a renewal quote from Underwriters and sent Bear a "Yacht Insurance Proposal" ("2013 Proposal") outlining the policy's key terms and exclusions. (Marsh's Ex. 37, ECF No. 71–5.) Like the prior two proposals, the 2013 Proposal warned Bear about the Repair Clause in the policy. (Marsh's Ex. 37, 437.) It stated:

**Policy Conditions that Apply During Yard Periods**

Maintenance and Repair Clause:

The policy will remain in full force while the yacht is undergoing maintenance, repair of any part or replacement of any *part like for like*. However, **NO COVERAGE** is provided in respect of refit, alteration, rebuild, remodeling, major repairs, any and all <u>hot work</u> other than soldering, **OR** <u>where the yard has requested any waiver of subrogation.</u>

Prior to any coverage being provided, the insured must submit the following for underwriters' specific agreement in writing:
- Full details and schedule of the work;
- Provide underwriters with a copy of the shipyard's Ship Repairers Liability Insurance

> Non compliance of any of the timeframes stated above will, in normal circumstances, void the insurance, at the discretion of the participating underwriters. Underwriters reserve the right to amend the terms and conditions hereunder, and to charge the appropriate additional premium.

(Id. (emphasis in original).)

On August 22, 2013, Trafton, who acted as Jodsaas' agent, signed an "Acknowledgment Form," taking notice of "important policy terms and conditions" in the policy. (Marsh's Ex. 39, ECF No. 71–5.) On August 23, 2013, Johnson sent Bear a Confirmation of Coverage, which contained the same warning regarding the Repair Clause as the 2013 Proposal did. (Marsh's Ex. 40, 464, ECF No. 71–6.) Lastly, on October 9, 2013, Johnson emailed Bear a copy of the 2013 policy with a cover letter that again advised Jodsaas to "keep in mind the warranties and exclusions of the policy . . . ." (Marsh's Ex. 41, ECF No. 71–6.)

The 2013 policy contained the following relevant provisions:

**CONDITIONS PRECEDENT**

### Maintenance and Repair Clause

> It is hereby understood and agreed that this insurance will remain in full force whilst your yacht is undergoing annual maintenance, repair of any part or replacement of any part like for like.
>
> **Notwithstanding the foregoing it is a conditions precedent that if the vessel is currently undergoing or may undergo major refit or repairs, alterations, remodeling or where hot work is being undertaken (other than soldering) or that the yard has requested a waiver of subrogation from the Owner or his Legal Representative(s), then prior agreement must be obtained from participating insurers hereunder.**
>
> Furthermore the Owner or his Legal Representative(s) must provide a copy of the current shipyards Ship Repairers Legal Liability insurance documentation and a full update or schedule of works being carried out during the period of this insurance and obtain Underwriters specific agreement (in writing).

4

> Underwriters participating hereon reserve their rights to amend the terms and conditions of this insurance and to charge an appropriate additional premium.

(Marsh's Ex. 42, 489.)

### D. Destruction of the *Polar Bear*

On May 6, 2014, the *Polar Bear* ran aground at the entrance of the San Diego Harbor damaging the bottom of the hull, port and starboard sides of the keel, and the aft port stabilizer shaft. (Trafton Decl. ¶¶ 61, 65.) Because of the damage, water began to leak through the damaged area around the stabilizer shaft. (Id. at ¶ 66.) The *Polar Bear* traveled on its own to the Marine Group Boat Works, LLC ("MGBW") boatyard in Chula Vista arriving on May 7, 2014, where it was to be repaired. (Id. at ¶ 68–69.) As a safety measure, the *Polar Bear* was accompanied by a diver and two small towboats. (Id. at ¶ 69.)

On May 7, 2014, just before the *Polar Bear* was hauled out, Trafton signed a written contract with MGBW. (Id. at ¶ 74.) The service contract provided that the *Polar Bear* would be hauled out, blocked and launched for a total of $3500. (Marsh's Ex. 44, 540, ECF No. 71–6.) The contract was double-sided but Trafton only signed the front-side. (Id.) The back-side contained several provisions, including an "owner assumption of risk" clause, an "owner's exclusive remedy" clause, and an "indemnity, insurance and waiver of subrogation" clause. (Id. at 541.) Bear did not notify nor acquire Underwriters' consent prior to signing the contract. (Marsh's Ex. 55, Tr. of Roger Trafton's Dep. 640:10–641:7, ECF No. 71–7; Trafton Decl. ¶ 84.)

From May 22, 2014 through early June, 2014, Trafton executed numerous work change orders for repairs to the *Polar Bear*, including a May 22, 2014 order for hot work repairs to the hull. (Marsh's Ex. 44, 543–565, ECF No. 71–6.) Bear did not notify nor acquire Underwriters' consent prior to executing the work change

orders.  (Marsh's Ex. 55, Trafton's Dep. Tr. 647:3–23.)  On June 17, 2014, Jodsaas spoke with Patrice M. Grossinger of Marsh and informed her that the *Polar Bear* hit some rocks as it traveled back from Mexico.  (Decl. of Jeffrey M. Posner, in Supp. of Bear's Opp'n, Ex. E, ECF No. 101–28.)  He communicated to her that it resulted in $250,000 in damages, but that he had not filed a claim with Johnson.  (Id.)  Grossinger advised him to contact Johnson if costs got any higher.  (Id.)  On June 19, 2014, the *Polar Bear* caught fire while welders were performing hot work.  (Trafton Decl. ¶ 90.)  The fire resulted in the *Polar Bear's* total loss.  (Id. at ¶ 6.)

On June 20, 2014, Marsh confirmed that the *Polar Bear* had been consumed by a fire and provided Underwriters with a notice of loss thereafter.  (Marsh's Ex. 47, ECF No. 71–6.)  On March 20, 2015, Underwriters denied coverage on the grounds that Bear had failed to satisfy the conditions precedent under the Repair Clause.  (Marsh's Ex. 50, 593–600, ECF No. 71–7.)

In March 2015, Underwriters filed this action seeking declaratory relief that it justifiably denied coverage for Bear's claim relating to the losses suffered to the *Polar Bear.*  (Compl. ECF No. 1.)  Bear filed counterclaims against Underwriters and a third-party complaint against Marsh, asserting claims for breach of oral contract, breach of fiduciary duty, and negligence.  (Bear's Second Countercl. and Second Third-Part Compl., ECF No. 63.)

## II. STANDARD

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure if the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997).  A dispute as to a material fact is genuine if there is sufficient evidence for

a reasonable jury to return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 323 (1986).

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to establish an essential element of the nonmoving party's case on which the nonmoving party bears the burden of proving at trial. Id. at 322-23. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

Once the moving party establishes the absence of genuine issues of material fact, the burden shifts to the nonmoving party to demonstrate that a genuine issue of disputed fact remains. *Celotex*, 477 U.S. at 314. The nonmoving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of his pleadings." Anderson, 477 U.S. at 256. Rather, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (quoting Fed.R.Civ.P. 56(e)).

The court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

//

//

# **III. DISCUSSION**

## **A. Breach of Contract**

Bear asserts a claim against Marsh for a breach of an oral contract to procure insurance coverage for the *Polar Bear*.

### **1. Breach of Oral Contract**

Under Florida law[1], to prevail on a breach of contract claim a plaintiff must establish: (1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from that breach. *Friedman v. N.Y. Life Ins. Co.*, 985 So.2d 56, 58 (Fla. Dist. Ct. App. 2008). It is undisputed that Marsh agreed to procure an insurance policy covering the Vessel's total loss from any cause at an agreed value of $17 million. Marsh now moves for summary judgment on Bear's breach of oral contract claim, arguing that there is no dispute that it obtained the insurance that Bear requested.

To support its position, Marsh submits that Underwriters themselves interpret the policy to provide $17,250,000 in coverage for the *Polar Bear* and all other property insured under the policy, assuming that Bear satisfies the terms and conditions contained in the policy. (Marsh's Ex. 52, 622, ECF No. 71–7.) Additionally, Marsh provides Trafton's deposition testimony, where he concedes that Marsh obtained the policy Bear requested. (Marsh's Ex. 55, Trafton's Dep. Tr. 575:10–13.) Bear, on the other hand, argues that the policy does not provide such coverage because it contained a Repair Clause that "limits coverage while the Vessel is undergoing major repairs and hot work, or following a yard's request for a waiver of subrogation." (Bear's Opp'n 11.) However, as already held by the Court in its order granting Underwriters' MSJ, the Repair Clause is not an exclusion, but instead a condition precedent or warranty by Bear. Had Bear

---

[1] In the Court's order denying Marsh's motion to dismiss, it found that in absence of established federal maritime law regarding an insurance broker's duties, Florida law applied to Bear's claims against Marsh. (ECF No. 56, 4.) As such, the Court continues to apply Florida law.

15-cv-630-BTM-BLM

satisfied these conditions precedent, the policy would have provided $17.25 million of coverage for the loss of the *Polar Bear*. Additionally, it is undisputed that the 2010 Proposal explained the effect of the Repair Clause on the Underwriters policy. Despite the warning, Bear ultimately chose the Underwriters policy and consented to its terms. Thus, there is no evidence to dispute that Marsh obtained a policy for the agreed upon value.

Bear also alleges that Marsh breached its contract by failing to fulfill several promises, such as failing to provide the "best risk solution for [Bear's] exposures," failing to "ensure that the most comprehensive and cost-effective insurance program is purchased," failing to obtain insurance "specifically designed to address the exposures and risks unique to yachts and their owners," failing to "work on Bear's behalf to provide efficient and effective claims resolution in the event of any incident with the *Polar Bear*," and failing to be "accountable for the service" it provides. (Bear's Opp'n 12.) The alleged contract at issue is an oral one. Under Florida law, a plaintiff asserting a breach of oral contract must prove that the parties "mutually assented to a certain and definite proposition and left no essential terms open." *W.R. Townsend Contracting, Inc. v. Jensen Civic Constr., Inc.*, 728 So.2d 297, 301 (Fla. Dist. Ct. App. 1999) (internal citations omitted). Bear takes statements[2] from the 2012 and 2013 insurance proposals that Marsh sent Bear and construes them as oral contracts. However, Bear has presented no evidence that Marsh assumed these contractual obligations. These statements are also not certain and definite propositions.

As such, the Court grants summary judgment in Marsh's favor on Bear's breach of oral contract claim.

---

[2] "We strive to be responsive to your direction and instructions to ensure that the most comprehensive and cost effective program is purchased." (Trafton Decl. Ex. A 3.) "We are dedicated to providing the best risk solution for your exposures and to protect your valuable asset." (Id. at 4.) "Our claims professional is dedicated to work on your behalf to provide efficient and effective claims resolution in the event of an incident with your yacht." (Id.) "You Marsh Team is accountable for the service we provide and plan to provide on your account." (Id. at 3.)

15-cv-630-BTM-BLM

## B. Breach of Fiduciary Duty

To prevail on a claim for breach of fiduciary duty, a plaintiff must prove that: (1) a fiduciary duty exists; (2) the duty was breached; and (3) the breach proximately caused plaintiff's damages. *Gracey v. Eaker*, 837 So.2d 348, 353 (Fla. 2002). Under Florida law, an insurance broker has a fiduciary relationship with the insured that requires the broker to inform and explain the coverage it has secured at the client's directions. *Wachovia Ins. Servs. V. Toomey*, 994 So.2d 980, 987 (Fla. 2008).

Marsh moves for summary judgment on Bear's second claim for breach of fiduciary duty arguing that it fulfilled its duty by warning Bear more than a dozen times about the conditions precedent in the policy, including the Repair Clause. Bear, on the other hand, argues that these warnings were not enough. Bear relies on Trafton's declaration in which he insists that Johnson never explained the Repair Clause to him or Jodsaas during a November 8, 2016 conference call. (Trafton ¶¶ 22–26.) Marsh urges the Court to apply the Ninth Circuit's sham affidavit rule and disregard Trafton's declaration because it contradicts his prior deposition testimony, specifically those portions related to the substance of that conference call. "The sham affidavit rule prevents a party who has been examined at length on deposition from raising an issue of fact simply by submitting an affidavit contradicting his own prior testimony, which would greatly diminish the utility of summary judgment as a procedure of screening out sham issues of fact." *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012) (internal citations omitted). In order to apply the rule, a district court must make "a factual determination that the contradiction is a sham, and the "inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit." *Id.* In *Yeager*, the Ninth Circuit affirmed a district court's finding that a declaration was a sham when it contained facts that the affiant previously testified he could not remember.

15-cv-630-BTM-BLM

Here, the Court declines to apply the rule because it cannot find that the inconsistencies between Trafton's testimony and deposition are "clear and unambiguous." Notwithstanding Bear's dispute with the substance of the November 8, 2014 conference call, the Court finds that as a matter of law, Marsh fulfilled its fiduciary duty to inform and explain the coverage it secured for Bear.

Marsh warned and advised Bear of the policy's warranties and conditions precedent numerous times and over the course of three years. In its insurance proposals it explained to Bear the conditions precedent attached to major repairs, hot work or when a shipyard required a waiver of subrogation. During his deposition, Trafton acknowledged that he and Jodsaas read and discussed the 2010 insurance proposal to determine the cost of insurance for the *Polar Bear*. (Marsh's Ex. 55, Trafton's Dep. Tr. 446:6–22; 450:20–22.) Additionally, before binding coverage, Marsh required Bear to sign acknowledgment forms certifying Jodsaas and/or Trafton's understanding of the policy. It is undisputed that Jodsaas and Trafton willingly signed these forms. Marsh also provided Bear with warnings in the confirmations of coverage it sent to Bear after binding coverage every year, as well as the cover letters attached to the actual policies it sent to Bear. Contrary to Bear's argument, these warnings were not buried in insurance materials. Given that the majority of their communications occurred via letters and emails, it was reasonable for Johnson to have warned Bear of these provisions in these documents. Trafton also testified that he was aware that when the *Polar Bear* went in for a yard visit, he was supposed to notify Marsh so that Marsh in turn, notified the insurer. (Marsh's Ex. 55, Trafton's Dep. Tr. 647:7–17.) Finally, though Johnson could not recall the exact date, she testified to having warned Jodsaas and Trafton about the limitations applied to yard periods specifically. (Marsh's Ex. 56, Johnson's Dep. Tr. 300:13–301:17.)

Bear argues that Trafton did not read the insurance proposals and as such, Marsh's breach of duty is not overcome by Bear's failure to read the underlying

documentation. Its argument fails for several reasons. First, Trafton testified that he did review and discuss the 2010 insurance proposal with Jodsaas. Second, the insurance proposals were not the only documents that contained warnings and explanations. Jodsaas and Trafton signed acknowledgment forms with every policy Marsh obtained and while not conclusive evidence of their understanding, it certainly lends support. *Cf. Adams v. Aetna Casualty & Surety Co.*, 574 So. 2d 1142, 1155 (Fla. Dist. Ct. App. 1991) (holding that while a signed acknowledgment form can be appropriately considered by the trier of fact along with all the other evidence of the insured's knowledge, it is alone insufficient to support a ruling as a matter of law). Moreover, the cases that Bear relies on to assert that Bear had no legal obligation to read the policies are inapplicable, as they do not deal with a claim for breach of fiduciary duty to inform and explain coverage.

The Court finds that as a matter of law, Marsh satisfied its fiduciary duty by providing Bear with over a dozen explanations and warnings. As such, Marsh's motion for summary judgment as to Bear's breach of fiduciary duty claim with respect to the procurement of the policy is granted.

## C. Negligence

Under Florida law, an insurance broker has a duty "to use reasonable skill and diligence" when procuring the insurance coverage requested by the insured. *Warehouse Foods, Inc. v. Corporate Risk Management Services, Inc.*, 530 So.2d 422, 424 (Fla. Dist. Ct. App. 1988). As already discussed above, the undisputed facts demonstrates that Marsh obtained the requested coverage for $17 million, and adequately informed and explained to Bear the terms and conditions of the policy.

Therefore, as a matter of law, it did not breach its duty of reasonable care in performing the agreement to procure insurance coverage for the *Polar Bear*. Accordingly, Marsh's motion for summary judgment as to its negligence claim with respect to the procurement of the policy is granted.

15-cv-630-BTM-BLM

**D. Heightened Fiduciary and Common Law Duties**

**1. Marsh's Breach of Duty to Advise and Recommend**

Bear also seeks to impose a heightened duty on Marsh to advise and recommend certain policies based on its needs.  Relying on an alleged "special relationship," Bear argues that Marsh breached both its fiduciary and common law duties by failing to advise and recommend the Chubb and/or Shipyard Repairer's Liability ("SRL") policies.

Ordinarily, an insurance broker has no duty to advise an insured as to the insured's coverage needs.  *Tiara Condo. Ass'n v. Marsh, USA Inc.*, 991 F. Supp. 2d 1271, 1280 (S.D. Fla. 2014).  However, as the court in *Tiara Condo. Ass'n v. Marsh, USA Inc.* recognized, there is a "special relationship" exception to the general rule of no duty to advise.  *Id.*  "The exception becomes operative when an insurance broker encourages and engages in a 'special relationship' with its client, thereby triggering an enhanced duty of care to advise the client about the amount of coverage prudently needed to meets its complete insurance needs."  *Id.* at 1281. After reviewing cases supporting a finding of a "special relationship," the court identified several factors for a trier of fact to consider when determining whether a broker shared a "special relationship" with its clients: "(1) representations by the broker about its expertise; (2) representations by the broker about the breadth of coverage obtained; (3) the length and depth of the relationship; (4) the extent of the broker's involvement in the client's decision making about its insurance needs; (5) information volunteered by the broker about the client's insurance needs; and (6) payment of additional compensation for advisory services."  *Id.* at 1281.

Here, the parties dispute whether a special relationship exists.  Bear argues that "[b]ecause it is undisputed that Marsh held itself out as an expert in yacht insurance and Bear relied on that expertise," Marsh owed Bear an enhanced duty of care.  (Bear's Opp'n 17.)  Marsh, on the other hand, argues that such a duty should not be imposed.  Bear has presented evidence of a long-term relationship

with Marsh, as well as its reliance on Marsh's expertise in making its purchasing decisions.  These facts, therefore, could support a finding by the trier of fact of a special relationship.  And if a special relationship did exist, there is evidence on which a trier of fact could conclude that Marsh breached its duty for failing to advise against a policy with the Repair Clause for a steel hull vessel.

Notwithstanding a dispute of fact as to a "special relationship," Marsh argues that summary judgment is appropriate because Bear cannot establish that a recommendation of the Chubb or SRL policies would have resulted in coverage.

### i.    *The Chubb Policy*

Bear argues that Marsh breached its fiduciary duty by failing to recommend the Chubb policy over the Underwriters policy in 2010, which would have allegedly covered the loss.  Marsh moves for summary judgment on this claim because it argues that Bear cannot establish causation.  The causation question depends on several factual issues.  It requires a trier of fact to determine: (1) would Bear have chosen the Chubb policy had Marsh recommended it in 2010, despite its concerns about pricing; (2) whether Chubb would have renewed on the same terms every year and Bear would have elected it every year; and (3) whether the Chubb policy would have covered the loss despite Bear's failure to notify.

To prove that Bear would have elected the Chubb policy had Marsh recommended it, Bear submits as evidence Trafton's Declaration.  Trafton states that "[i]f Johnson had pointed out the superior coverage aspects of the Chubb policy, together with the huge gap in coverage created by the Maintenance and Repair Clause, and recommended the purchase of the Chubb policy, I would have concurred, and believe that Johnson would have done so as well.  We had a $17 million boat at stake, and had already experience a fire caused by welding while the *Polar Bear* was being built."  (Trafton Decl. ¶ 27.)  Bear also submits the testimony of Michael Fitzgerald who submits that it is highly probable that Chubb would have continued to offer the same policy, Bear would have continued to

renew it, and it would have covered the loss. (Decl. of Michael Fitzgerald, in Supp. of Bear's Opp'n to Marsh's MSJ ("Bear Opp'n"), ECF No. 101–31, ¶¶ 53–56.) At this stage, there is a material dispute of fact on this issue. Thus, Marsh's motion for summary judgment on this claim is denied.

Because the Court finds that there is a triable case as to Bear's claim for breach of an enhanced duty, at least as it relates to the Chubb policy, the Court need not consider Plaintiff's SRL theory.

### 2. Grossinger's Breach of Duty to Act After Learning of the Repairs

Bear also alleges that Grossinger, while acting as its agent, had a duty to take appropriate action after its June 17, 2014 conversation with Jodsaas. It contends that after Grossinger spoke to Jodsaas and learned that the *Polar Bear* was undergoing repairs, she should have either notified Underwriters of the ongoing repairs, and/or advised Trafton to stop all repair work on the *Polar Bear* until the issue of coverage was addressed with Underwriters. Though ordinarily the issue of agency is a question of fact, a court may resolve it on summary judgment where the evidence compels only one interpretation. *Underwriters of Lloyd's of London v. CZX Prods.*, 686 So.2d 706, 708 (Fla. Dist. Ct. App. 1996). Here, the evidence only compels one interpretation—no agency relationship existed between Grossinger and Bear.

To establish the existence of an agency relationship, a plaintiff must show: (1) acknowledgment by the principal that the agent will act on his or her behalf; (2) acceptance by the agent; and (3) control by the principal over the agent's actions. *Graham v. Lloyd's Underwriters at London*, 964 So.2d 269, 275 (Fla. Dist. Ct. App. 2007). Alternatively, "such authority may be presumed from a long course of dealing between the parties." *Id.* (internal citations omitted). Under Florida law, it is well-settled law that once a broker or agent procures the insurance requested by the insured, his or her employment and duty end. *Graham*, 964 So.2d at 275. However, where "a broker or agent is instructed by an owner with the duty of

keeping the owner's property insured, taking out policies thereon, and authorized to obtain insurance in lieu of expired or canceled policies, the broker or agent is the general agent of the owner in these respects as to the latter's insurance." *Cat'N Fiddle, Inc. v. Century Ins. Co.*, 213 So.2d 701, 704 (Fla. 1968) (quoting *Stuyvesant Ins. Co. v. Barkett*, 11 S.W. 2d 87, 89 (Ky. Ct. App. 1928)).

Here, Bear relies on Marsh's insurance proposals as well as its internal professional standards to argue that Marsh, and specifically Grossinger, expressly agreed to act as Bear's agent after procuring insurance. As discussed above, the statements made in Marsh's insurance proposals fall short of oral contracts. Thus, they cannot be construed as the parties' express agreement of Marsh's general agency. Bear also does not cite to any legal authority to support its claim that Marsh should be bound by its internal professional standards.

While Bear did have a long history of obtaining yacht insurance policies through Marsh, it obtained these policies through Marsh's Yacht Group and worked with Johnson as its broker. Grossinger, on the hand, brokered Jodsaas' personal insurance lines. She was never involved, in any capacity, with the procurement of the yacht insurance for the *Polar Bear*. (Marsh's Ex. 57, Tr. of Patricia Grossinger's Dep. 63:8–14.) Accordingly, Bear has failed as a matter of law to establish the existence of a general agency relationship. *See Burgos v. Indep. Fire Ins. Co.*, 371 So.2d 539, 541 (Fla. Dist. Ct. App. 1979) (affirming a lower court's grant of summary judgment on a claim for failure to procure replacement coverage where the record contained no evidence that the insurance broker acted as a general agent for the insurer). On these facts, Grossinger was under no duty to inform Underwriters or Johnson of Jodsaas' phone call, or to maintain adequate coverage for the *Polar Bear*.

The Court grants summary judgment as to this claim.

### E. Objections and Mash's Motion to Strike

Both parties raise objections to several declarations, exhibits, and

undisputed material facts submitted in support of the opposing parties' papers. Having reviewed the parties' objections and responses, the Court rules as follows:

- Bear's Objections to Marsh's Exhibits 7, 9, 23, 26, 28, 31–33, 37, 39–41, 44, and 47 are overruled.
- Marsh's Objection to Michael Fitzgerald's Decl. ¶¶ 51–54 is overruled without prejudice.

Because the Court did not rely on the remaining materials in reaching its decision, it overrules those objections as moot.

Additionally, on September 30, 2016, pursuant to this Court's chambers rules, Bear filed a sur-reply addressing evidentiary matters arising out of Marsh's reply brief. (ECF No. 105.) On October 12, 2016, Marsh filed a motion to strike certain portions of Bear's sur-reply, arguing that its scope goes beyond merely responding to the objections in Marsh's reply brief. (ECF No. 111.) The rule provides in relevant part:

> Responses to objections contained in a reply brief may be made in a sur-reply brief that does not exceed five pages. The scope of such a sur-reply is limited to responses to objections; any additional argument will be disregarded. Any separately filed objections shall be stricken and will not be considered by the Court.

Hon. Barry Ted Moskowitz Civ. Chambers Rules at 2, Objections, (Feb. 24, 2015), https://www.casd.uscourts.gov/Rules/SitePages/Home.aspx.

Having reviewed Bear's sur-reply brief, the Court finds that pages 3:23–5:23 of Bear's response exceed the permitted scope under the chambers rules. However, there is no prejudice to Marsh. Accordingly, Marsh's motion to strike certain portions of Bear's sur-reply brief is **DENIED.**

## IV. CONCLUSION

For the reasons discussed above, Marsh's motion for summary judgment (ECF No. 71) is **GRANTED IN PART AND DENIED IN PART.** Marsh's motion to

15-cv-630-BTM-BLM

strike (ECF No. 110) is **DENIED**.  The Clerk shall enter judgment for Marsh on Bear's claims for breach of contract, breach of general fiduciary duty, negligence, and breach of duty to act after learning of the repairs.  Bear's claim for breach of a heightened duty to advise and recommend certain policies shall proceed to trial.

**IT IS SO ORDERED.**

DATED: May 17, 2017

BARRY TED MOSKOWITZ
Chief Judge, United States District Court

15-cv-630-BTM-BLM