UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BEAR, LLC,<br>        Third-Party Plaintiff,<br>v.<br>MARSH USA, INC.,<br>        Third-Party Defendant. | Case No.: 15-cv-00630-BTM-BLM<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

On November 6–17 and 28–29, 2017, the Court held a bench trial on Plaintiff Bear, LLC's ("Bear") claims against Third-Party Defendant Marsh USA, Inc. ("Marsh"). The Court's findings of fact and conclusions of law are set forth below.

## I. FINDINDS OF FACT

### A. Procuring Insurance for the *Polar Bear*

In 2004, Marsh began serving as Bear's yacht insurance broker. Larry Jodsaas ("Jodsaas"), Bear's sole owner, owned a boat named the *Aphrodite* for which Marsh procured insurance with Chartis ("AIG") as the insurer. Katherine Harris Johnson ("Johnson") was the sole Marsh Yacht Insurance Practice broker assigned to Bear's account. In March 2008, while Jodsaas still owned the *Aphrodite*, Johnson learned that Jodsaas was building another boat, the *Polar*

*Bear*. The boat would be a 102-foot steel hull motor vessel, which Jodsaas predicted would be completed by the Spring of 2008. However, due to numerous construction delays including a fire caused by welding, the *Polar Bear* was not launched until 2011.

Throughout this time, Jodsaas and Johnson communicated every few months via phone calls and emails about the status of the *Polar Bear*. In June 2010, Johnson and a colleague traveled to Seattle to visit local shipyards and during that trip met with Roger Trafton ("Trafton"), Captain of the *Polar Bear*, at the Aleutian Yachts[1] boatyard. Trafton oversaw the *Polar Bear*'s construction and served as Jodsaas' agent in all matters involving the *Polar Bear* including insurance matters. Johnson introduced herself to Trafton as a yacht insurance specialist and expressed her interest in procuring insurance for the *Polar Bear*. Trafton gave Johnson a tour of the *Polar Bear*.

In September 2010, in anticipation of the *Polar Bear*'s delivery date, Jodsass and Johnson began discussing insurance. She emailed him an application for the new vessel and Trafton assisted Jodsaas in filling it out. After receiving a completed application, Johnson, at Jodsaas' direction, requested quotes from numerous insurers including ACE Ltd. ("ACE"), Federal Insurance Company ("Chubb"), AIG, Lloyd's of London ("Lloyd's"), and LEAD Yacht. Marsh secured terms from Chubb, AIG, ACE, and Lloyd's, all of which offered $17,250,000 agreed-value hull coverage in the event of a total loss. Using a template Marsh created, Johnson prepared the 2010 Risk Management Review and 2010 Yacht Insurance Proposal for Jodsaas and Trafton to review and compare the various insurance options for the *Polar Bear*. The proposal included quotes and terms from AIG, ACE, Lloyd's, and Chubb. The proposal also included explanations and warnings about material terms, including provisions

---

[1] Aluetian Yachts later changed its name to Citadel Yachts.

related to waivers of subrogation, contractual liability exclusions, and policy conditions that apply during periods of time that the Polar Bear would be in a shipyard. Trafton reviewed the proposal with Jodsaas. Among the factors most important to Jodsaas were the cost of the policies and navigational limit terms. Lloyd's offered the most inexpensive option coupled with the lowest deductible, and was the only insurer to offer a no claims bonus. On November 8, 2010, Johnson held a conference call with Trafton and Jodsaas to review the proposal. Jodsaas expressed that he was leaning towards the Lloyd's policy. On March 18, 2011, after requesting revisions to the Lloyd's terms per Jodsaas' instruction, Johnson again held a conference call with Jodsaas and Trafton to discuss the revised terms. At this point, it had become clear that Jodsaas was only considering the Lloyd's policy. Johnson continued to check in with Jodsaas and made a recommendation that the Lloyd's policy would get him "the most bang for [his] buck."

    Jodsaas ultimately made the decision to bind with Lloyd's. On August 23, 2011, Jodsaas signed a confirmation of binding instructions form, as well as an acknowledgment form. The confirmation of binding instructions form provided an overview of the policy Jodsaas was purchasing. He ultimately purchased a policy with Lloyd's, British Marine, and Water Quality Insurance Syndicate ("WQIS"). The acknowledgment form served as additional warning that the policy Jodsaas was purchasing had exclusions and warranties that may require action on his behalf and could impact or void coverage, including the Maintenance and Repair Clause ("Repair Clause"). By signing the form, Jodsaas acknowledged that Marsh had sufficiently explained the warranties' implications and that he understood them. Without his signature on these forms, Johnson could not have moved forward with binding the Lloyd's policy. The policy became effective as of August 23, 2011. On October 20, 2011, Jodsaas received from Marsh the original policy along with a cover letter that again

warned him of the warranties and exclusions contained in the policy. It strongly recommended that Jodsaas contact a maritime attorney and Marsh before signing any contracts with shipyards, marinas or any third-party vendors.

Generally, the only time of the year Johnson contacted Jodsaas or Trafton was during the renewal process. In July 2012, Johnson reached out to Jodsaas to begin the renewal process. She instructed him to complete a luxury yacht insurance application and advised him that once received, she would seek renewal terms from the same underwriters unless otherwise advised. Trafton returned the application and stated no objection to seeking renewal terms from the same underwriters, including Lloyd's. After obtaining renewal quotes, Johnson created a Yacht Insurance Renewal Proposal for Jodsaas and Trafton to review. In 2012, Lloyd's, British Marine, and WQIS offered the same terms as in 2011. Like the 2011 proposal, the 2012 proposal included explanations of material terms in the policy. Jodsaas approved the renewal terms and Johnson bound coverage. Johnson sent Jodsaas a Confirmation of Coverage, as well as the original policy with an attached cover letter, both of which contained the same warnings as the previous year. That same year, Jodsaas received a no claims bonus for having filed no claims during the 2011–2012 policy term.

In July 2013, Johnson again contacted Jodsaas and sent him an insurance application to begin the renewal process. Trafton filled out the application and returned it to Johnson. On page three of the application, in the "number of yard periods planned for next 12 months" section, Trafton had made a handwritten mark. It appears to be "1" with a squiggly line over it. The Court finds it to be an indication of one yard visit in 2014. Despite the handwritten notation, Johnson did not follow up with Trafton or Jodsaas and instead retyped the application she forwarded to the underwriters without any indication of a yard visit. Johnson obtained renewal quotes from the underwriters and prepared the 2013 proposal which again included the terms and warnings of the policy. Lloyd's, British Marine,

and WQIS offered the same terms as the two previous years. That year, Lloyd's also reduced its premium by $9,740.51. Like the prior two proposals, the 2013 proposal warned Bear about the Repair Clause in the policy. It stated:

**Policy Conditions that Apply During Yard Periods**

Maintenance and Repair Clause:

The policy will remain in full force while the yacht is undergoing maintenance, repair of any part or replacement of any *part like for like*. However, **NO COVERAGE** is provided in respect of refit, alteration, rebuild, remodeling, major repairs, any and all hot work other than soldering, **OR** where the yard has requested any waiver of subrogation.

Prior to any coverage being provided, the insured must submit the following for underwriters' specific agreement in writing:
- Full details and schedule of the work;
- Provide underwriters with a copy of the shipyard's Ship Repairers Liability Insurance

Non compliance of any of the timeframes stated above will, in normal circumstances, void the insurance, at the discretion of the participating underwriters. Underwriters reserve the right to amend the terms and conditions hereunder, and to charge the appropriate additional premium.

Jodsaas indicated to Johnson that Trafton would handle insurance matters moving forward. Trafton signed the confirmation of binding instructions and acknowledgment forms on behalf of Jodsaas. As she had done in previous years, Johnson bound coverage and sent Trafton and Jodsaas a Confirmation of Coverage and the original policy, both containing the same warnings about the policy's terms and warranties. The 2013 policy, like the two previous policies, contained the following relevant provisions:

**CONDITIONS PRECEDENT**

**Maintenance and Repair Clause**

> It is hereby understood and agreed that this insurance will remain in full force whilst your yacht is undergoing annual maintenance, repair of any part or replacement of any part like for like.
>
> **Notwithstanding the foregoing it is a conditions precedent that if the vessel is currently undergoing or may undergo major refit or repairs, alterations, remodeling or where hot work is being undertaken (other than soldering) or that the yard has requested a waiver of subrogation from the Owner or his Legal Representative(s), then prior agreement must be obtained from participating insurers hereunder.**
>
> Furthermore the Owner or his Legal Representative(s) must provide a copy of the current shipyards Ship Repairers Legal Liability insurance documentation and a full update or schedule of works being carried out during the period of this insurance and obtain Underwriters specific agreement (in writing).
>
> Underwriters participating hereon reserve their rights to amend the terms and conditions of this insurance and to charge an appropriate additional premium.

(Emphasis added).

### B. Destruction of the *Polar Bear*

On May 6, 2014, while on its way to Marine Group Boat Works, LLC ("MGBW") in Chula Vista, California for maintenance work, the *Polar Bear* ran aground on the Zuniga Jetty at the entrance to the San Diego Bay. The impact damaged the bottom of the hull, port and starboard sides of the keel, and the aft port stabilizer shaft. After a stop at the Harbor Police dock for some emergency repairs, the *Polar Bear* traveled on its own to the MGBW boatyard arriving on May 7, 2014, where it was to be repaired. As a safety measure, the *Polar Bear* was accompanied by a diver and two small towboats. Trafton did not call Marsh to inform it about the accident.

On May 7, 2014, just before the *Polar Bear* was hauled out, Trafton signed a written contract with MGBW. The service contract provided that the *Polar Bear*

would be hauled out, blocked and launched for a total of $3500. The contract was double-sided but Trafton only signed the front-side. The back-side contained several provisions, including an "owner assumption of risk" clause, an "owner's exclusive remedy" clause, and an "indemnity, insurance and waiver of subrogation" clause. Trafton did not notify Marsh nor independently acquire Lloyd's consent prior to signing the contract.

From May 22, 2014 through early June, 2014, Trafton executed numerous work change orders for repairs to the *Polar Bear*, including a May 22, 2014 order for welding (hot work) repairs to the hull. Trafton did not notify Marsh nor independently acquire Lloyd's consent prior to executing the work change orders. On June 17, 2014, Jodsaas spoke with Patrice M. Grossinger, Jodsaas' personal insurance broker from Marsh, and informed her that the *Polar Bear* hit some rocks as it traveled back from Mexico. He communicated that it resulted in $250,000 in damage, but that he had not notified or filed a claim with Johnson because the damage was less than the deductible[2]. Grossinger advised him to contact Johnson if costs got any higher. On June 19, 2014, the *Polar Bear* caught fire while welders from Universal Steel Fabrication, Inc. ("USF") performed hot work. The fire resulted in the *Polar Bear's* total loss.

On June 20, 2014, Marsh learned that the *Polar Bear* had been consumed by a fire and provided Lloyd's with a notice of loss. On March 20, 2015, Lloyd's denied coverage because Bear failed to satisfy the conditions precedent under the Repair Clause.

**C. Court Proceedings**

In December 2014, Bear filed an action against MGBW and USF for negligence and gross negligence, among other claims. On May 25, 2017, Bear settled with MGBW for $9.2 million, resolving all claims between the two parties.

---

[2] In fact, Jodsaas was in error. The deductible under the cost favorable Lloyd's policy was $121,500.

7

USF never appeared in the action and the Court granted Bear default judgment on December 12, 2017.

In March 2015, Lloyd's filed this action seeking declaratory relief that it justifiably denied coverage for Bear's claim relating to the losses suffered to the *Polar Bear*. Bear filed counterclaims against Lloyd's and a third-party complaint against Marsh, asserting claims for breach of oral contract, breach of fiduciary duty, and negligence. On April 21, 2017, the Court granted Lloyd's summary judgment, holding that Bear had breached the terms of the Repair Clause and Lloyd's justifiably denied coverage. On May 17, 2017, the Court granted and denied in part Marsh's motion for summary judgment. The Court held that Marsh obtained insurance for the *Polar Bear* that provided it with $17,250,000 in coverage. The Court also held that Marsh satisfied the standard duties imposed under Florida law in procuring insurance for the *Polar Bear*.

## II. JURISDICTION AND APPLICABLE LAW

The Court has admiralty jurisdiction over this action because it directly relates to Bear's marine insurance policy. *See Stanley T. Scott & Co. v. Makah Dev. Corp.*, 496 F.2d 525, 526 (9th Cir. 1974) (holding that a marine insurance broker's claim against the insured to recover its advanced premium was "integrally related to the marine insurance policy" and therefore fell within admiralty jurisdiction). Ordinarily, with regard to marine insurance policies, state substantive law applies in the absence of an established federal maritime rule, federal statute, or a need for uniformity in admiralty practice. *Certain Underwriters at Lloyd's, London v. Inlet Fisheries, Inc.*, 518 F.3d 645, 649–50 (9th Cir. 2008). Substantive state law also applies to disputes arising from contracts for the procurement of maritime insurance. *See Illinois Constructors Corp. v. Morency & Assocs., Inc.*, 802 F. Supp. 185, 187 (N.D. Ill. 1992). The parties here do not submit that established federal maritime rules apply and the Court has not identified any. Therefore, state law applies to Bear's claims.

A court sitting in admiralty must apply federal maritime choice-of-law rules. *Aqua-Marine Constructors v. Banks*, 110 F.3d 663, 670 (9th Cir. 1997). Here, as already held by the Court at the pleading stage, Florida law applies to Bear's claims against Marsh because it is the state with the "'most significant' relationship to the substantive issue in question." *Id.* at 673 (quoting *Albany Ins. Co. v. Anh Thi Kieu*, 927 F.2d 882, 891 (5th Cir. 1991)). The insurance policies were procured by Marsh's Ft. Lauderdale, Florida Yacht Insurance Practice. Johnson, Marsh's representative from the Florida office, discussed and negotiated the terms of insurance policies on Bear's behalf. Accordingly, the Court applies Florida law to the substantive issues in the action.

## III. FURTHER FINDINGS OF FACT AND CONCLUSIONS OF LAW

Bear brings negligence and breach of heightened fiduciary duties claims against Marsh. To prevail on either of these causes of action, Bear must show by a preponderance of evidence that: (1) Marsh and Bear engaged in a special and fiduciary relationship requiring Marsh to advise Bear on its insurance coverage; (2) Marsh breached its duty by failing to advise and recommend that Bear purchase a Chubb policy or a Ship Repairer's Liability ("SRL") policy; (3) but for the breach, Bear would have purchased a policy that would have paid for the *Polar Bear*'s loss; and (4) such breach resulted in $17,250,000 in damages. *See Tiara Condominium Ass'n, Inc. v. Marsh, USA, Inc.*, 991 F. Supp. 2d 1271, 1279–80; *see also Southtrust Bank v. Exp. Ins. Servs.*, 190 F. Supp. 2d 1304, 1309–10 (M.D. Fla. 2002).

As discussed below, the Court holds that Bear and Marsh did not engage in a special relationship so as to give rise to a heightened duty to advise Bear on its insurance coverage. Additionally, even if they did maintain a special relationship, Bear has not established that Marsh breached its duty in recommending the Lloyd's policy over the Chubb policy. As to the SRL policy, though Marsh should have followed up with Bear about the handwritten mark on the 2013 insurance

application, Bear's claims nevertheless fail because it cannot prove causation. The Court discusses each element below.

**A. Existence of Special Relationship**

As a threshold matter, the Court must determine whether Bear has proven by a preponderance of evidence that it engaged in a special relationship with Marsh. In Florida, and in other states, the general rule is that insurance brokers have no duty to advise clients about their insurance needs. *Tiara Condominium Ass'n, Inc.*, 991 F. Supp. 2d at 1280. Only where a special relationship exists have courts departed from the general rule and found that a broker assumed a heightened duty to advise. *Id.* at 1281. However, a finding of a special relationship is rare and an exception to the general rule of no duty to advise. *Id.*; *Voss v. Netherlands Ins. Co.*, 8 N.E.3d 823, 829 (N.Y. 2014).

Whether an insurance broker shared a "special relationship" with its client is a question of fact. *Tiara Condominium Ass'n, Inc.*, 991 F. Supp. 2d at 1281–82. In determining whether such a special relationship exists, a trier of fact may look to a non-exhaustive list of factors including: (1) representations by the broker about its expertise; (2) representations by the broker about the breadth of the coverage obtained; (3) the length and depth of the relationship; (4) the extent of the broker's involvement in the client's decision making about its insurance needs; (5) information volunteered by the broker about the client's insurance needs; and (6) payment of additional compensation for advisory services. *Id.* at 1281. After reviewing all of the evidence presented at trial, the Court holds that Bear has not met its burden in demonstrating that it maintained a special relationship with Marsh.

Bear argues that Marsh's and Jodsaas' long-term relationship serves as evidence of a special relationship. In addition to managing Jodsaas' personal insurance lines, Marsh began serving as Jodsaas' yacht insurance broker in 2004 when Marsh procured insurance for the *Aphrodite*. Bear points to the

communications between Johnson, Jodsaas, and Trafton as evidence of a close working relationship. However, a review of those communications reveals that it was not a deep working relationship beyond what is expected between an insurance broker and his or her client. During the time leading up to the launch of the *Polar Bear*, Johnson periodically checked in with Jodsaas about the yacht's delivery date. Due to numerous construction delays, the launch date was repeatedly pushed back. Johnson routinely inquired about the *Polar Bear*'s progress to ensure that Marsh went to market for terms and secured insurance in time for its delivery date. Bear also points to Johnson's visit to the shipyard in 2010 as evidence of a deep relationship. However, Johnson was already in Washington making visits to other shipyards and as she, Damon Nasman, and even Scott Jarvie testified, brokers visit shipyards in an effort to gather business. Moreover, after Marsh placed insurance for the *Polar Bear* in 2011, Johnson generally only spoke to Jodsaas and Trafton, via phone or email, during the renewal process once a year. In the nearly 10 years that Marsh served as Jodsaas' broker, Johnson never met Jodsaas in person and only met Trafton once during her 2010 visit to the shipyard. The Court finds that these communications are what would ordinarily be expected of a typical broker-client relationship. While not a factor the *Tiara* court identifies, it is also worth noting that neither Trafton nor Jodsaas found it important to inform Marsh or Johnson about the *Polar Bear*'s accident. This too dispels Bear's argument that it engaged in a deep relationship with Marsh.

      Bear also argues that Marsh held itself out as a yacht insurance expert and because Jodsaas and Trafton relied on this representation and its advisement in choosing the Lloyd's policy in 2010, a special relationship existed between the two. In supporting its argument, Bear relies on the 2010 Risk Management Review and yearly insurance proposals that Johnson gave to Jodsaas and Trafton. Additionally, Bear points to Johnson's title of "client

advisor" as evidence of establishing a special relationship. Notwithstanding the fact that Jodsaas and Trafton did not pay particular attention to the content of these documents, detrimental to Bear's argument is the fact that Marsh provided these services to all of its clients. While Johnson's title is that of a "client advisor," it is of little significance given that every broker within the Yacht Practice holds that title. As to the documents Johnson provided to Bear, they were standard templates that Marsh uses for every client. In fact, Bear did not pay extra compensation for these services. They were undertaken by Marsh in an effort to obtain Bear's business. Upon receiving the terms of each carrier, Johnson inserted the terms and explanations using language that senior client advisors had previously approved. Though Johnson eventually recommended the Lloyd's policy as the most cost effective choice, this was only after it became clear that Jodsaas was primarily interested in Lloyd's because it was the most inexpensive policy. At every step during the original placement and subsequent renewals, Johnson checked in with Jodsaas and Trafton and acted only after being directed to do so. Johnson could not have gone to market for the terms nor could she have placed the insurance without Jodsaas and Trafton authorizing her to do so. Indeed, witness testimony from Johnson, Debbie Philibert, and Nasman supports that the placement of insurance for the *Polar Bear* was in line with standard practice. While Jarvie may not provide his clients with these types of insurance proposals explaining the terms of the policies he procures, the Court is not convinced that his personal practice is demonstrative of the industry standard.

      Perhaps in an effort to counter the fact that Marsh offers these services to all of its clients, Bear argues that the mere nature of the policy, namely its complexity and the need for a broker to serve as a liaison between an insurer and insured, should demand a finding of a special relationship. Bear is effectively asking the Court to find that all brokers within Marsh's Yacht Practice

maintain a special relationship with their clients given the nature of the policy and the services rendered. As stated above, a special relationship is only found in rare circumstances and such a categorical finding would contravene the purpose of the exception. The Court is not willing to expand the exception beyond its intended narrow scope.

Additionally, Marsh was not compensated by Bear for its services. Instead, Marsh received a commission from Lloyd's for brokering insurance to Bear.

Accordingly, the Court holds that Bear has not shown by a preponderance of evidence that it maintained a special relationship with Marsh so as to trigger a heightened duty to advise Bear on coverage.

**B. Breach**

Notwithstanding the Court's finding of no special relationship, even if Marsh and Bear did engage in a special relationship, Bear has not proven that Marsh breached a heightened duty to advise. Bear argues that Marsh breached its heightened duty by failing to recommend the Chubb policy over the Lloyd's policy and by failing to recommend the SRL policy in 2013. The Court discusses each alleged breach below.

*1. Failure to Recommend Chubb Policy in 2011*

Bear argues that Marsh breached its heightened duty to advise when it failed to recommend the Chubb policy over the Lloyd's policy in 2011.

Bear contends that Marsh provided Bear with an erroneous insurance proposal in 2010 that misrepresented the costs and terms of each policy. Bear alleges numerous errors within the proposal including an omission of a second Chubb policy option, a discrepancy in the number of crew required under the Lloyd's policy, and an erroneous comparison of all four policies. Above all, Bear submits that Marsh failed to properly advise Bear because it provided a proposal that made the four carriers appear comparable when in reality the Lloyd's policy was an inferior choice because it contained the Repair Clause. Bear primarily

relies on the testimony of Michael Fitzgerald to support its argument that Marsh should have recommended the Chubb policy because it was far and away the superior option. According to Fitzgerald, he would not have recommended the Lloyd's policy because it contained the Repair Clause which was onerous to an insured.

In a bench trial, the district court judge "acts as both gatekeeper and factfinder." *Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1068 (7th Cir. 2013). The Judge must determine both the admissibility of the expert evidence under Federal Rule of Evidence 702 and whether it is credible. *Id.* "[G]reat weight" is given to a district court's credibility determinations of expert witnesses, which constitute findings of fact. *Id.* at 1069. Here, the Court does not find Fitzgerald's testimony to be credible for several reasons[3]. Prior to this case, Fitzgerald had never reviewed a Chubb, AIG, or ACE policy. He also had never dealt with the Repair Clause and had no experience with how it applied in either a non-loss or loss situation. Furthermore, Fitzgerald's testimony was contradicted by that of Johnson, Philibert, and Nasman, who the Court finds to be very credible. The Court does not credit Fitzgerald's opinion that the Repair Clause is onerous and thus renders the Lloyd's policy inferior to the other policies offered in the 2010 proposal.

The evidence reveals that Johnson outlined the terms and conditions of all four carriers in the 2010 proposal, including several warnings concerning contractual liability waiver provisions and the Repair Clause under the Lloyd's policy. The proposal disclosed the possibility that an additional premium would be charged in connection with the Repair Clause. Notwithstanding a potential 10% additional premium under the Lloyd's policy, it still was the least expensive option and was the only policy that offered a no claims bonus. Lloyd's is a

---

[3] The Court also does not find Trafton, Posner, and Darby to be credible.

reputable insurer within the yacht insurance market that Trafton was familiar with and had worked with throughout the years. There is no evidence to indicate that Lloyd's was not suitable to provide insurance for a steel-hull boat because of the Repair Clause. In fact, several industry brokers testified to the contrary. Moreover, whether it was under the Lloyd's policy or Chubb policy, an insured in a non-loss situation could not waive subrogation for hot work without notice to the insurer and would be charged an additional premium. In fact, the additional premium is typically higher with Chubb. Even under a loss situation, if the insured provides notice to the insurer, both the Chubb and Lloyd's policies operate the same. Thus, considering that the cost of the premium was an important factor to Jodsaas and that Lloyd's provided the most coverage for the least amount of money, the Court finds that Marsh did not breach any heightened duty to advise by not recommending the Chubb policy over the Lloyd's policy. Perhaps other brokers may have recommended the Chubb policy in this instance, but the fact that Johnson did not does not amount to a breach of duty.

### 2. Failure to Recommend SRL Policy in 2013

Bear's second theory of liability rests on Marsh's failure to recommend an SRL policy in 2013 after receiving the insurance application for that year. The Court heard extensive testimony over the 2013 application. There is a dispute of fact as to whether the handwritten mark was either a "1" that had been scratched out or a "3" that had been scratched out and replaced by a "1." The Court finds that Trafton wrote "1" to indicate an anticipated yard visit for 2014. Regardless, Johnson did not confirm whether it was an intentional mark and submitted the application to Lloyd's stating no yard visit without clarifying with Trafton first.

Bear argues that had she followed up, Trafton would have gathered the necessary information regarding the planned yard visit. Based on that information, she then should have recommended an SRL policy to supplement the existing coverage from Lloyd's. Marsh, on the other hand, argues that

despite Johnson's failure to clarify, she still would not have recommended an SRL policy because the Lloyd's policy would have provided sufficient coverage for the *Polar Bear* during planned shipyard visit. While the Court does find that a reasonable broker would have followed up with Trafton to clarify the discrepancy on the application, Bear's claim still fails because it cannot show causation.

**C. Causation**

Lastly, Bear's claims fail because it has failed to show by a preponderance of evidence that Marsh's alleged breaches caused Bear's damages. It is worth noting that Bear must prove that Chubb or the underwriters under the SRL policy would have paid $17,250,000 for the *Polar Bear*'s total loss. Bear appears to argue that it only needs to prove that the accident was a fortuitous loss and that it occurred during the policy period. It contends that the burden should then shift to Marsh to show that the loss is excluded or otherwise not covered. Bear, however, is charged with showing that it would have been paid $17,250,000, as those are the alleged damages it suffered as a result of Marsh's breach of its duty to advise.

### *1. Failure to Recommend Chubb Policy in 2011*

Even if Marsh breached its heightened duty of care in not recommending the Chubb policy over the Lloyd's policy in 2011, Bear is still unable to demonstrate that it would have purchased the Chubb policy and that Chubb would have paid Bear for the *Polar Bear*'s loss.

There is ample evidence to demonstrate that Jodsaas' principle concern in choosing a policy in 2011 was the cost of the premium. Upon reviewing the insurance proposal, Jodsaas expressed his interest in the Lloyd's policy and directed Johnson to seek revised terms under the Lloyd's policy in an effort to make the premium even less expensive. While Trafton testifies now, nearly seven years later, that had Marsh advised against the Lloyd's policy or recommended the Chubb policy they would have considered purchasing Chubb,

it is not sufficient to satisfy Bear's burden of proof. The Court finds the self-serving testimony not to be credible and finds as a fact that Jodsaas would not have purchased a policy that offered less coverage at a higher premium cost.

Moreover, Bear has not proven by a preponderance of evidence that Chubb would have paid Bear $17,250,000 for the *Polar Bear*'s total loss notwithstanding Trafton's and Jodsaas' failure to notify it of the March 6th jetty strike and subsequent major repairs. The Chubb policy lists several duties an insured must satisfy after suffering a loss, including immediately notifying Chubb, an agent, or a broker of the loss, cooperating with and assisting Chubb in facilitating the investigation and adjustment of a loss, and taking all reasonable means that are necessary to protect the property from further loss or damage. The evidence demonstrates that Bear did not provide Marsh or Lloyd's with notice of the jetty strike. Bear's attempts to reconcile its failure to provide Marsh with notice of the jetty strike and subsequent major repairs by arguing that it provided immediate notice after the fire on June 19, 2014. However, Bear has submitted no evidence to support that Chubb would have ignored Bear's initial breach of its duty to notify and paid for a loss that was caused by work performed in connection with the original unnoticed accident.

Based on the evidence submitted at trial, the Court cannot find that Marsh's alleged failure to recommend the Chubb policy in 2011 caused Bear to suffer $17,250,000 in damages.

### *2. Failure to Recommend SRL Policy in 2013*

In order to prevail on its claim that Marsh should have recommended an SRL policy in 2013, Bear must demonstrate by a preponderance of the evidence that with that policy in place, it would have recovered $17,250,000.

Bear argues that had Johnson followed up on the 2013 insurance application, Trafton would have informed her of an intended yard visit which would have led Johnson to secure coverage from Lloyd's and/or an SRL policy.

However, Bear's argument fails for several reasons. First, Trafton did not know the details of the yard visit until April 2014. Without this information, as unrebutted testimony revealed, Johnson could not purchase an SRL policy. Second, even if Johnson had followed-up and learned of the intended yard visit, Johnson would still not have recommended an SRL policy because a routine yard visit would have already been covered under Bear's existing Lloyd's policy.

Lastly, even if Marsh had secured coverage either under the Lloyd's policy or SRL policy for the planned yard visit, Bear would still not recover for the *Polar Bear*'s loss because the SRL policy would not extend to an unplanned visit and Lloyd's would still require notice and prior approval for the subsequent major repairs.

In an effort to rewrite history, Bear argues that had Johnson secured additional coverage, she would have re-advised Trafton on the conditions under the Repair Clause, causing Trafton to eventually comply with the terms and notify Marsh and Lloyd's of the jetty strike. Indeed, if Trafton had provided notice of the original loss, the *Polar Bear* would have been covered. The entire case turns on Jodsaas' and Trafton's failure to provide notice. The Court has already ruled that Johnson satisfied her standard duty as a broker by explaining and warning Jodsaas and Trafton about the policy's conditions. Based on the evidence before it, Bear has not shown by a preponderance of evidence that Trafton, having been warned over a dozen times before, would have complied with the Repair Clause after being warned once more. Such a finding would be based on pure speculation. Accordingly, Bear's claim fails on this ground as well.

//
//
//
//
//

# III. CONCLUSION

For the reasons discussed above, the Court finds in favor of Defendant Marsh and against Plaintiff Bear on its claims for negligence and breach of fiduciary duty. The Clerk shall enter judgment for Marsh and against Bear.

**IT IS SO ORDERED**.

Dated: April 20, 2018

*[signature]*

Barry Ted Moskowitz, Chief Judge
United States District Court